**Robert W. Tunnell, Plaintiff-Appellant, v. Edwardsville Intelligencer, Inc., a Corporation, Defendant-Appellee.**

Gen. No. 67–46.

Fifth District.

August 14, 1968.

Dick H. Mudge, Jr., of Edwardsville, for appellant.

Gordon Burroughs, Burroughs, Simpson and Burroughs, of Edwardsville, and Emerson Baetz, of Alton, for appellee.

EBERSPACHER, P. J.

This is a defamation suit wherein the plaintiff, Robert W. Tunnell, a licensed attorney and city attorney of Edwardsville, Illinois, brought suit against the defendant, Edwardsville Intelligencer, Inc., a daily newspaper, for publishing and circulating an allegedly libelous article on February 23, 1961.

The cause was tried before a jury and on May 11, 1966, the jury returned the following verdict: "We, the jury, find in favor of the plaintiff and against the defendant, and assess plaintiff's compensatory damages in the sum of $none dollars, and the punitive damages in the sum of $35,000.00 dollars."

The court failed to enter judgment on the verdict but thereafter on June 29, 1966, ruled on defendant's motion for a directed verdict which had been made at the close

of all the evidence and filed a written opinion which concluded with the following order:

"That the verdict of the jury is contrary to law, and that there is no basis for libel under the facts and the law.

"That the verdict of the jury is in favor of the defendant.

"Judgment is hereby entered in favor of the defendant and against the plaintiff . . . ."

Plaintiff filed his post-trial motion which was denied; and the plaintiff then appealed. After the plaintiff had filed his brief and the defendant its answer, a motion was filed in this Court suggesting the death of the plaintiff and moving to substitute Lena S. Tunnell, Executor of the Estate of Robert W. Tunnell, deceased, as the plaintiff. The plaintiff's motion was accompanied with a further motion withdrawing the plaintiff's portion of the appeal that sought a new trial. The defendant filed objection to the motion to substitute and a motion to dismiss alleging that the action had abated upon the death of the plaintiff. There has been no ruling upon the motions and by an order entered by this Court, the motions were taken with the case.

We decide the question of abatement first because if the action abates due to the death of the plaintiff, it would be needless to pass upon the merits of the case.

■ At common law, and now by statute, a suit in the nature of defamation abated upon the death of either the plaintiff or defendant and was subject to dismissal with prejudice upon such death without the possibility of revivor in the name of a personal representative. Chapter 3, § 339, Ill Rev Stats (1965); Chiagouris v. Jovan, 43 Ill App2d 220, 193 NE2d 205 (1963).

■ However, a second question is presented when the cause is pending appeal for in that event, the cause of action has gone to judgment and a different situation

4

exists. In such a case the cause of action ceases to exist, being merged in the judgment, and consequently so long as the judgment remains in force, the doctrine of abatement has no further application, unless the case is one in which the death wholly eliminates the matter in controversy. Wedig v. Kroger Grocery & Baking Co., 278 Ill App 378.

In the present case the plaintiff obtained a verdict. However, judgment was never entered upon this verdict. We note that section 68(2) of the Civil Practice Act requires the Court to promptly enter judgment on the verdict upon its return by the jury. Chapter 110, § 68, Ill Rev Stats 1965. When viewed in this light, the effect of the court's subsequent order was to set aside the judgment which should have been entered on the return of the jury's verdict.

The purpose of this appeal is to substantiate by a reversal in this Court, the validity of the judgment, and thus obtain the benefit of the judgment which should have been rendered on the verdict. This, of course, will be the result if the appeal is successful. It is not as if a judgment had never been obtained, in which case, the cause of action would have abated. By the trial court's action, and this appeal, the judgment is simply held in abeyance and may or may not become effective to the plaintiff, that issue depending entirely upon the determination of the other question in this Court as to whether the court erred in setting aside the judgment. It is our opinion that the effect of the appeal is to suspend the operation of the order setting aside the judgment and to keep alive the judgment until the appeal is determined. It is not a question of whether the cause of action survives, for the cause of action has merged in the judgment and the validity of the judgment is the question at issue.

The question appears to be one of first impression in the State of Illinois as neither of the parties, nor from our own research have we found any Illinois cases bear-

5

ing directly upon this issue. However, our opinion is supported by opinions in other jurisdictions which have passed upon the issue. Crawford v. Chicago, Rock Island & Pac. Ry. Co., 171 Mo 68, 66 SW 350 (1902); Wright v. Northern Pac. Ry. Co., 45 Wash 432, 88 P 832 (1907).

Under the circumstances of this case it is our opinion that the cause of action had merged into the judgment, that the motion to substitute the plaintiff's executor as the party plaintiff and the motion withdrawing the request for a new trial should be granted, and the defendant's motion to dismiss denied.

The article complained of [1] concluded with the following sentence, on which plaintiff based his complaint:

---

[1] The complete article as published on February 23, 1961 follows:

1956 Referendum Here Set
Up 3-Man Fire Police Board

By Clarence C. Anderson
of The Intelligencer Staff

Like the old pea shell game, the question of who has jurisdiction in fire and police appointments seemed to be something of a slight-of-hand problem in the city today—at least in some circles.

On May 22, 1956, the citizens of Edwardsville voted by a 2 to 1 margin to set up a police and fire commission. The powers of this commission were adopted and signed into law by Mayor George L. Moorman, Jr., on June 5, 1956.

Ordinance 1011 states: "There shall be a Board of Fire and Police Commissioners in the City of Edwardsville, Illinois, as provided by law, which shall consist of three members appointed by the Mayor with the consent of the City Council." Section Two further states: "The Board of Fire and Police Commissioners shall have charge of all appointments to the Fire and Police Departments and shall conduct and hold all entrance and promotional examinations in the manner required by law."

The local law was given further teeth with the passage of a law by the General Assembly on May 16, 1957, of the Board of Fire and Police Commissioners Act which made a fire and police commission mandatory in municipalities with a population of more than 5,000.

Commissioners showed disbelief when City Attorney Robert Tunnell told members of the City Council that he was not familiar

6

> "Rumors on the main stem today had it that Atty. Tunnell was working to break the law, whether it was the city or state law was not explained."

with the state statute on the board's powers and duties but went on to say he did not think such a statute could be passed in Illinois.

Mayor William C. Straube told those present that he had personally reappointed John Schwartzkopf of 110 North Kansas St. every 30 days since his first temporary appointment more than a year and a half ago.

Article 14–10 of the state law entitled, "Temporary appointments" states: "In order to prevent a stoppage of public business, to meet extraordinary exigencies, or to prevent material impairment of either the police or fire department, THE BOARD may make temporary appointments, to remain in force until regular appointments may be made under the provisions of this article, BUT NEVER TO EXCEED SIXTY DAYS." (Editor's Note: Caps are our own.)

Commissioners pointed out that Mayor Straube had no jurisdiction whatsoever in making a reappointment every 30 days. Chairman Orval W. Legate told reporters that under the law which governs his group that not even the commission itself had the power to extend a temporary appointment more than 60 days. He also pointed out that at no time did a request to take steps to make the appointment permanent come from the Board of Aldermen. The first step in all appointments must come from the Aldermen asking that the existing vacancy be filled. After this request has been made to the Fire and Police Commissioners, the entire process, according to the state law, is then left in their powers.

Article 14–4 of the state law states: "The board of fire and police commissioners shall appoint all officers and members of the fire and police departments of the municipality, including the chief of police and the chief of fire department unless the council or board of trustees shall by ordinance as to them otherwise provide."

Another question which arose was who would get the appointment to the fire department. Rule 14–8 states: "The board of fire and police commissioners shall prepare and keep a register of persons whose general average standing, upon examination, is not less than the minimum fixed by the rules of the board, and who are otherwise eligible. These persons shall take rank upon the register as candidates in the order of their relative excellence as determined by examination, without reference to priority of time of examination."

7

■

If the verdict returned by the jury, which made no award for compensatory damages, precludes recovery by the plaintiff, we need not determine whether a case of actionable libel was presented; as a result we consider first defendant's second contention, i. e. that the verdict finding no actual damages but awarding punitive damages, requires a judgment for the defendant.

■ On this point defendant relies on the general rule that punitive damages must depend on a concurrent award of actual damages, citing numerous Illinois cases and including Geach v. Olson, 211 F2d 682 (CA 7th, 1955), where it is stated that Illinois courts follow the rule that punitive damages cannot be allowed without proof of actual damage.[2] None of those cases cited are libel cases; although Reeda v. Tribune Co., 218 Ill App 45, concerns a suit against a publisher, in which the court was specifically advised that the declaration did not proceed on the theory of libel nor on "false words causing damage," and the court found no cause of action stated.

---

Chairman Legate pointed out that the replacing of John Schwartzkopf was being done in keeping with the law. The temporary appointee had not taken the fire examination because of his age, the maximum age limit for qualification being 35 years of age.

Further impetus was given to the powers of the state law by the law firm of McConnell, Kennedy, McConnell and Morris on Jan. 20, 1959 when they ruled that office of police chief for the city was covered by Section 14–11 of the state law. The ruling was given for a police association of which local law officers are members.

The question of appointments to the fire and police department is not something new according to Chairman Legate who stated he met with Mayor Straube and Atty. Tunnell six months ago to help familiarize them with the existing laws. Rumors on the main stem today had it that Atty. Tunnell was working to break the law, whether it was the city or state law was not explained.

[2] The Federal rule does not require the establishment of actual damages as the basis for the assessment of punitive damages. Wardman-Justice Motors v. Petrie, 39 F2d 512.

8

■ The rule which plaintiff contends is applicable in this case is stated in 33 Am Jur, Libel and Slander, § 202;

> ". . . where the defamation complained of is actionable per se, it is generally held that punitive damages may be awarded even though the amount of actual damages is neither found nor shown."

That rule has been reiterated in numerous Illinois defamation cases; see Lorillard v. Field Enterprises, 65 Ill App2d 65, p 78, 213 NE2d 1, p 7; Wade v. Sterling Gazette Co., 56 Ill App2d 101, p 106, 205 NE2d 44, p 47; Cowper v. Vanier, 20 Ill App2d 499, p 501, 156 NE2d 761, p 762. In Lorillard (supra) and the other cases cited therein, the Court reiterated the long established rule that in cases of defamatory falsehood, that is, a statement which is libelous per se, both malice and damage to reputation are presumed. However, since the case of New York Times v. Sullivan, 376 US 254, 11 L Ed2d 686, 84 S Ct 710 (1964), and Curtis Pub. Co. v. Butts, 388 US 130, 11 L Ed2d 1094, 87 S Ct 1975 (1967), malice is no longer presumed if the plaintiff is a public official or a "public figure" nor can malice be presumed if the article complained of is a report of governmental acts or utterances. Lulay v. Peoria Journal Star, Inc., 34 Ill2d 112, 214 NE2d 746 (1966). However, an examination of those cases discloses that the rule with reference to the presumption of damage to reputation in such case is not changed.

To adopt the view that punitive damages in such defamation cases were dependent upon the allowance of actual damages, would be to allow a defamer some immunity because of the excellent reputation of the person defamed, and allow the defamer to become the beneficiary of the unassailable reputation of the one defamed.

9

In Butts, supra, the U. S. Supreme Court pointed out "We would hold, therefore, that *misconduct sufficient to justify the award* of compensatory damages also justifies the imposition of a punitive award, subject of course to the limitation that such award is not demonstrated to be founded on the mere prejudice of the jury." (Italics ours.) Curtis Pub. Co. v. Butts, supra, 87 S Ct 1975, at p 1994. They did not state that an *award* of compensatory damages was necessary to justify punitive damages, or that punitive damages could only be awarded when compensatory damages were *awarded*.

We therefore hold that the verdict of the jury was not, as the trial court found and declared, "a finding for defendant"; nor was it a nullity as defendant contends, and a judgment for the defendant was not required by law for the reason that the jury made no award of actual damages, if the language complained of was libelous per se.

Plaintiff, at the time of the trial, was 69 years old and a teacher of business law, real estate and political science at Lincoln College. He had been licensed to practice law in Illinois since 1922, in Missouri since 1921 and in New Mexico since 1947 or 1948. He was a graduate of Washington University Law School and practiced law in Edwardsville from 1922 until 1948. He had taught at Washington University Law School, at Southern Illinois University at Carbondale and at Bradley University before his appointment in the summer of 1960 as city attorney, an office which he held approximately 10 months. He had been twice selected by a major political party as nominee for probate judge and one time as its nominee for circuit judge. His appointment as city attorney was made by the Mayor of the city with whom he was politically aligned, but plaintiff made no speeches or statements nor did he write any advertisements or campaign material during the Mayor's campaign for reelection, which was being carried on at the time of the publica-

10

tion of the allegedly libelous article. Plaintiff presented ample evidence of his excellent reputation and the high esteem in which he was held by the general public and the members of his profession.

■ In Whitley v. Associates Discount Corp., 59 Ill App2d 337, p 340, 207 NE2d 482, Judge Coryn of the 3rd District pointed out that in Illinois there are five classes of words which give rise to a cause of action for slander if falsely communicated, and that a majority of American jurisdictions apply the rules applicable to slander to libel as well; he further pointed out: "If the false words, by their plain, ordinary meaning, and without resort to innuendo, impute anything within the first four offensive categories, the slander is one per se requiring no allegation or proof of special damages." Included among the first four categories are:

1. Those imputing the commission of a criminal offense;
2. Those imputing infection with a communicable disease of any kind which, if true, would tend to exclude one from society;
3. Those imputing inability to perform or want of integrity in the discharge of duties of office or employment;
4. Those prejudicing a particular party in his profession or trade.

Those categories have been reiterated by the First District in Coursey v. Greater Niles Tp. Pub. Corp., 82 Ill App2d 76, 227 NE2d 164, and approved by the Supreme Court in its recent opinion (filed May 29, 1968) affirming that case, 40 Ill2d 257, 239 NE2d 837 (1968). Here the words may fairly be said to fall into two of the four categories, namely, imputing a want of integrity in the discharge of duties of office, and prejudicing plaintiff in his profession.

11

■ Defendant in answering plaintiff's amended complaint denied that the last sentence of the article was wholly false and untrue and denied that it had any knowledge that such statement was false and untrue. We consider the evidence conclusive to the effect that it was wholly false and untrue, as did the trial court. That no such rumor existed at the time the author caused the article to be put into print is the only conclusion that can be drawn from the author's own testimony.

■ The trial court, after the verdict, found that the article was not libelous per se, apparently adopting the contention that defendant makes in this Court, to the effect that "clarity in thinking will be served if the Court is reminded that modern ruling under both local Illinois law and Federal constitutional limitations, as presently interpreted, are such that it is simply impossible to have a publication libelous per se when the person defamed is a public official." Defendant interprets Lulay v. Peoria Journal Star, supra, and New York Times v. Sullivan, supra, as authority for such proposition, but a careful reading of those cases discloses that they do not render a publication which reports proceedings, or one which has to do with the conduct of a public official, immune from being libelous per se. The short answer to such contention may be found in the Supreme Court opinion in Coursey v. Greater Niles Tp. Pub. Corp., supra, in which the Court specifically found the alleged publication to constitute libel per se in a case in which the plaintiff was determined by the court to be a public official and within the New York Times guidelines, which in such case require that the public official need allege and prove that the libelous publication was made with knowledge that it was false or with reckless disregard of whether it was false or not. Our Supreme Court in the Coursey opinion leaves no question that the doctrine of libel per se is applicable when the person allegedly defamed is a public official.

12

Defendant contends that the article was a privileged communication and as such required proof that the publication was made "solely for the purpose of causing harm to the person defamed," and urges that the evidence shows that defendant was reporting and commenting upon governmental matter as it had developed during governmental proceedings and was reporting and commenting during a political campaign which embraced the governmental matter as one of its issues; that the governmental matter was the question of whether the mayor was ignoring an applicable ordinance and statute in making repeated temporary appointments to a post of city employment; the political campaign was a mayoralty contest in which the mayor was running for reelection; the governmental proceedings were meetings of the city council, attended by plaintiff as city attorney and by the mayor; that plaintiff admitted that he had advised and commented on the applicable ordinance and statute, and that plaintiff owed his appointment to the mayor, a friend of long standing. We think the evidence with reference to the matter being privileged is more significant for what defendant failed to prove than the evidence upon which defendant has commented.

There is absolutely no evidence presented that at any of the council meetings supposedly covered that plaintiff did or said anything that could reasonably give rise to a rumor that plaintiff was working to break any law; the mayor is not the person who is complaining of any defamation—plaintiff is and he was not a candidate for any office. There is no evidence that plaintiff was participating in any way in the mayor's campaign for reelection. Although the defendant was attempting to make the question of appointments to the Board of Fire and Police Commissioners an issue in the mayor's campaign for reelection, there is nothing in the record to show that plaintiff, or the mayor on plaintiff's advice, had made this an issue.

13

Defendant urges its contention of a privileged communication which requires proof that it was made "solely for the purpose of causing harm to the person defamed" is supported by Lulay v. Peoria Journal Star, supra.

■ In the most recent proclamation in this field, the Supreme Court in Coursey v. Greater Niles Tp. Pub. Corp., supra, said:

> "With respect to defendant's contention that the article was a privileged comment on quasi-judicial proceedings, the appellate court correctly stated the controlling principle as expressed in the Restatement of Torts, § 611, that a newspaper is privileged to report the activities of a 'municipal corporation or of a body empowered by law to perform a public duty . . . although it contains matter which is false and defamatory, if it is (a) accurate and complete or a fair abridgement of such proceedings, and (b) not made solely for the purpose of causing harm to the person defamed.'
>
> "It then noted that the Restatement position was adopted by this court in Lulay v. Peoria Journal-Star, 34 Ill2d 112, 115, with that decision being followed by appellate courts in subsequent cases. (E. g., Segall v. Lindsay-Schaub Newspapers, Inc., 68 Ill App2d 209, 215.) However, the court held that 'These decisions are distinguishable from the instant case, for here the defendants published what turned out to be an *inaccurate account* of the proceedings of the Fire and Police Commission. The error was therefore solely attributable to the defendants and hence the matter is not within the privilege hereinbefore discussed.' 82 Ill App2d at 83."

The present case is likewise distinguishable from Lulay and the Appellate decisions following it. Here the language complained of does not purport to be an accurate or fair report of any governmental proceedings; it pur-

14

ports to be only a report of a rumor current in the community. While it may be true that there was contention among the City Council with reference to the mayor's temporary appointments, the last sentence clearly encompassed the "sting or gist" of the alleged libelous publication. It is that sentence that imputes "want of integrity in the discharge of duties of office" and prejudiced plaintiff in his profession. It cannot be said to be an accurate or fair account of governmental proceedings or of the report of issues in a political campaign, and thereby precludes defendant from invoking the fair comment privilege. See Coursey v. Greater Niles Tp. Pub. Corp., supra. As a result the trial court erred in holding that the plaintiff was required to prove that the article was motivated by actual malice solely for the purpose of causing harm to the plaintiff.

▇ Defendant has here, as did defendant in Coursey, contended that the article was not defamatory but only capable of an innocent construction. We have pointed out that under the authority of Whitley v. Associates Discount Corp., supra, the language complained of, even when read with the entire article, cannot be read innocently, and are within these categories which constitute libel per se. In Colmar v. Greater Niles Tp. Pub. Corp., 13 Ill App2d 267, 141 NE2d 652, the Court held an article accusing two lawyers of instigating a lawsuit and charging an "extortionate" fee for their work and that they faced possible disbarment proceedings because of unethical tactics was libelous per se, saying any statement published of an attorney at law with respect to his profession is actionable if it tends to injure or disgrace him as a member of his profession.

In the present case by plaintiff's instruction #9, the jury was instructed, without objection from the defendant, that in determining the meaning of the words referring to plaintiff they were to take the words used in the sense which readers of common and reasonable under-

15

standing would ascribe to them, that is according to their common and ordinarily accepted meaning. Obviously the trial court in the first instance, after hearing the testimony of the author, considered the words ambiguous or equivocal in meaning, and under the authority of Ogren v. Rockford Star Printing Co., 288 Ill 405, 123 NE 587, the question was properly submitted to the jury.

In John v. Tribune Co., 24 Ill2d 437, 181 NE2d 105, our Supreme Court concluded that the publications could not be read as "of and concerning" the plaintiff, since they referred only to a person other than the plaintiff. In its opinion, the Court did not make any reference to Ogren v. Rockford Star Printing Co., supra, and held that the publications were innocent as to the plaintiff since they were not capable of being construed as referring to her. The language there could not be actionable per se because it was held to refer to a person other than plaintiff. Here there is no possible reference to any one other than Attorney Tunnell nor was it contended that he was not the "target."

 In our opinion this language was not capable of an innocent construction. The statement that Attorney Tunnell was working to break the law was equally an attack upon his integrity and honesty as an attorney and in his official capacity as city attorney. Such a statement would also subject him to the scorn and ridicule of his fellow citizens and colleagues. An attorney has a special duty, greater than that of his fellow citizens, to respect and uphold the law whatever it may be. It is difficult for an attorney to differentiate between his conduct as a citizen and his conduct in his capacity as an attorney. The newspaper referred to the plaintiff as an attorney and in his capacity as a city attorney and therefore it must be presumed he was being accused of intending to break the law as an attorney and in his official capacity as city attorney. Such action on his part would have been in violation of his duty as an attorney and as

16

an officer of court as well as in his capacity as city attorney. This kind of accusation would naturally tend to subject the plaintiff to scorn, disrespect, and distrust by his fellow citizens and members of his profession. To publicly accuse an attorney of incompetence or ineptness is bad enough; to accuse him of dishonesty or having formed an intention of breaking the law is inexcusable. It is properly said that any words which charge an attorney with dishonest or improper practices in the performance of his duties as an attorney are actionable per se. 33 Am Jur, Libel and Slander, § 76.

The jury heard the explanation of the article as presented by the evidence of the author, Clarence Anderson, including his stating that he decided after plaintiff filed suit that the meaning would have been clearer if he had used the word "change" instead of "break," and admitted that he knew of no efforts on the part of the city administration or the plaintiff to have any law changed. Although he testified he had never intentionally deceived the public by anything he had written in the newspaper, he admitted he had written a letter to the editor signed "Peter Johnson," while employed by defendant; he also testified that he was the assistant to the publisher. Not only did his testimony show that he had serious doubts as to the truth of the publication but reasonable men could from that testimony only conclude that Anderson knew that the language complained of was not true, and his awareness of the fact that he was originating and causing false information to be circulated. His use of a libel against plaintiff cannot be rationalized as resulting from the heat of a political campaign in which plaintiff was not involved.

In New York Times Co. v. Sullivan, supra, the Court held that the first and fourteenth amendments delimit a State's power to award damages to a public official in a libel action for a defamatory falsehood relating to his official conduct unless he proves that the statement was

17

made with "actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not. Coursey v. Greater Niles Tp. Pub. Corp., supra. By Curtis Pub. Co. v. Butts, supra, the U. S. Supreme Court required the same degree of proof for those characterized as "public figures" on the theory that "public figures" as do public officials, command sufficient continuing public interest and have sufficient access to the means of counterargument to be able "to expose through discussion the falsehood and fallacies of the defamatory statements."

We find no reported cases holding that a city attorney is a public official within the rules affording freedom of comment upon him. On the authority of Illinois court decisions and opinions of the Attorney General, his position is described in 8 ILP, 244.[3] We believe the position of city attorney as therein described, has, or appears to the public to have, substantial responsibility for or control over the conduct of governmental affairs. One in such position is thrust into public controversy, as plaintiff was by defendant in the present case, and at least has the public meetings of the City Council for a forum in which to expose through discussion the falsehoods and fallacies of the defamatory statement. Plaintiff therefore was required to overcome the New York Times Co. v. Sullivan,

---

[3] "He is the law officer of the city, not a mere servant of the city council; rather he is the legal adviser of the council and of all city officers, under a duty to advise the city officers with respect to their powers and duties, and he represents the city in all legal matters.

"While he is bound to obey the directions of the city council concerning litigation with respect to matters wholly within control of the council, in matters which merely concern the public, which are for preservation of morals and maintenance of good order, the abatement of public nuisances, and the destruction of dens of vice and infamy, he is wholly independent of the city council and is a servant of the People, and as to such matters is vested with powers and burdened with duties over which the council has no jurisdiction."

supra, constitutional protection by proving that the defamatory statement was made with knowledge that it was false or with reckless disregard of whether it was false or not.

Plaintiff's amended complaint which by reference incorporated the entire article, charged actual malice couched in the language of New York Times v. Sullivan, supra, as follows:

> "The defendant composed, printed, published and circulated said article, and particularly the last sentence thereof, as aforesaid, with actual malice, that is to say: With knowledge that it was a false and untruthful statement or with reckless disregard of whether it was false or not."

The trial court, however, refused to instruct the jury defining actual malice as with the knowledge that it was a false and untruthful statement or with reckless disregard of whether it was false or not, but instead instructed, over plaintiff's objection, that plaintiff had the burden of proving "that the matter was composed and published with actual malice, that is, solely for the purpose of causing harm to the plaintiff"; in addition, the court gave its own instruction [4] regarding plaintiff's burden of proving actual malice which advised the jury, "Plaintiff must prove that defendant's news article was conceived or inspired solely because of a malicious design to injure the plaintiff." Despite the fact that the instructions imposed a greater burden of proof than the law imposes, the jury

_____
[4] It is also to be noted that the court gave its own instruction declaring plaintiff to be a public official and "that said article, even if a defamatory falsehood, was privileged, under the guarantees of the freedom of speech and of the press as guaranteed by the First and Fourteenth Amendments to the Constitution of the United States and, that in order to recover he must prove that the article in question was made with actual malice by the defendant, that is, with knowledge that it was false or with reckless disregard of whether it was false or not."

19

found for the plaintiff. It must be assumed that the jury followed the instructions, and in awarding plaintiff a verdict for punitive damages actually found the plaintiff had been injured in his reputation but simply did not award compensatory damages, realized that both plaintiff's general and professional reputation in the community was of such calibre that it could withstand, without destruction, such rumors, even if they existed. Such reasoning on the part of the jury is particularly logical in view of the fact that they were given plaintiff's instruction No. 10, which was:

> "The Court instructs the jury that if you find that the article of February 23, 1961 was published with actual malice then the plaintiff is entitled to damages as defined in these instructions. In such case, you may award the plaintiff compensatory damages or punitive damages or both compensatory and punitive damages."

While this instruction was commented upon by defendant's counsel, the court treated the comments as an objection which was overruled, but in no sense can the comments be interpreted as an objection to the language to the effect that the jury could award either compensatory or punitive damages, or both.[5] In view of defendant's failure to make a specific objection (that punitive damages could not be awarded without an award of compensatory damages; the position which defendant takes on appeal) there is a serious question whether defendant

---

[5] Defendant's counsel's comment was: "We are dubious. Under Sullivan, actual malice is necessary, and under Lulay, actual malice may consist only in a pointed effort to harm the plaintiff, alone. We also believe Sullivan would require a differentiation between compensatory and punitive damages in the pleading and in the instruction and in the verdict; and we believe that Sullivan, in its general aspects, would require proof of damage before damages (compensatory) could be awarded."

should now be allowed to be heard to make such contention in this Court, although we have considered that contention.

We have previously commented on the testimony of the author and his explanation of the article. He testified that he considered that there was such a rumor because of discussions he had engaged in with Legate who contended he was legally a member of the Board of Commissioners and the mayor who contended he was not. He admitted that neither of them told him of any intentions of plaintiff to either break or change any law; that he did not know whether the mayor had discussed the matter with plaintiff and that although he was present at council meeting when plaintiff was present, and the appointments were discussed, the author had never discussed the matter of appointments, the ordinance or statute, with plaintiff. He testified that the sole basis of the story was a conversation he had with the mayor in which the mayor stated, "If this was a law, it should be changed." He testified that he did not publish the fact that the mayor made such statement in connection with the matter because the mayor did not wish his name used in connection with the matter, although he admitted that defendant frequently found fault with the mayor's administration in their editorials supporting his opponent. Numerous publications of defendant were introduced into evidence attacking the mayor and using his name, as well as making derogatory remarks about plaintiff.[6]

---

[6] In one of the editorials the opening paragraph set forth the first amendment of the Constitution of the United States, and accused plaintiff and the mayor of making a travesty of it, and justice; in the same editorial the author stated that Americans had been in at least 8 recorded battles defending principles which they thought were right, in which 1,096,917 were killed and 1,276,-520 were wounded, and referring to plaintiff continued "The usurping of the ideals for which these men fought and died, just as denying a man an opportunity to defend himself, is unexpressable."

He testified that the paper did not try to "lambaste anyone." From this evidence reasonable men might very well conclude that the libelous material was composed and published with a "malicious design to injure the plaintiff."

The author also testified that he composed the article complained of at about 11:00 a. m. on the date of publication and that the paper in which it was included went to press at 4:30 p. m.; that he had never asked plaintiff what his intentions were, but thought he had tried to contact him either by telephone or going to his office while writing the story. He admitted that it was about six weeks before the mayoralty election which defendant sought to influence and that it was not necessary that the article be published on February 23 rather than a few days later, after an opportunity to authenticate the story. As was said in Curtis Pub. Co. v. Butts, supra:

> "In short, the evidence is ample to support a finding of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers."

The jury was by the evidence, justified in determining that no investigation was made of plaintiff's attempts or intents with reference to either the state law or city ordinance, and no effort made to determine if rumors concerning plaintiff's attempts or intent existed, and that defendant was in "reckless disregard of whether it was false or not."

In St. Amant v. Thompson, 390 US 727, 20 L Ed2d 262, 88 S Ct 1323 (1968), the Supreme Court of the United States pointed out:

---

In conclusion the editorial accused plaintiff of participating in a mockery "blindfolding all forms of justice and human decency."

"The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."

In Belli v. Orlando Daily Newspapers, Inc., 389 F 579 (1967), the Court said at page 584:

"The defendants made a case—just barely—for the view that the article is capable of being reasonably interpreted as nondefamatory. But since the article on its face is also capable of carrying a defamatory meaning, it is for the jury to decide whether the words were in fact so understood."

and at page 585 continued:

"We hold that a jury might reasonably conclude that the conduct imputed to Belli was incompatible with the standards of an ethical lawyer and as such violated one of the four traditional categories of libel per se" . . . . "Any doubt as to the defamatory effect of a publication should be resolved by the common mind of the jury, and not by even the most carefully considered judicial pronouncement."

We conclude that in the present case the trial court erred in its conclusion, arrived at after the verdict, that the alleged libelous material was nonactionable as a matter of law and in ordering "that the verdict of the jury is contrary to law, and that there is no basis for libel under the facts and the law"; and in entering a judgment for defendant on a verdict for plaintiff.

We therefore grant plaintiff's motions and deny the motion to dismiss the appeal; we reverse the judgment for defendant and here enter judgment on the verdict in favor of plaintiff, Lena S. Tunnell, Executor of the Estate of Robert W. Tunnell, deceased, against the defendant, Edwardsville Intelligencer, Inc., a Corporation, in the amount of $35,000 and costs.

Judgment for defendant reversed and judgment entered on verdict for plaintiff.

GOLDENHERSH and MORAN, JJ., concur.