WILLIAM J. MOORE *et al.*, Plaintiffs-Appellees, v. DANIEL STREIT, Defendant-Appellant.

Second District   No. 2—88—0653

Opinion filed April 13, 1989.

Stephen M. Haugh, of Michael C. Poper, P.C., of Crystal Lake (Michael C. Poper, of counsel), for appellant.

Kell, Nuelle & Loizzo, of Woodstock (Thomas F. Loizzo, of counsel), for appellees.

JUSTICE DUNN delivered the opinion of the court:

Plaintiffs, William Moore, chief of police for the Village of Cary, and six other Cary police officers, filed an action for slander against defendant, Daniel Streit, the owner of an automotive body shop in the village. The jury awarded no actual damages to plaintiffs, but awarded $6,500 in punitive damages to Moore and $1,500 in punitive damages to each of the other six plaintiffs. Defendant raises the following contentions on appeal: (1) that it was improper to award punitive damages to plaintiffs when there were no actual damages; (2) that the trial court erred by giving certain instructions which permitted the jury to presume malice if the alleged defamatory remarks were slanderous *per se*; (3) that since Moore was the only plaintiff specifically named in the alleged slanderous remarks, the other plaintiffs were not entitled to recover; (4) that a certain anonymous flyer critical of the Cary police force was erroneously admitted into evidence; and (5) that the trial court erred by denying defense motions for a mistrial as a result of certain misconduct by the attorneys for plaintiffs. We reverse and remand.

At trial, plaintiffs presented evidence concerning numerous allegedly slanderous statements made by defendant, including many which were not alleged in their amended complaint. In the following summary of the evidence presented at trial, we will focus primarily upon testimony relating to the slanderous remarks actually alleged in the amended complaint.

Gary Verdung testified that he had a conversation with defendant at the River Bend Restaurant in September 1981. Verdung's wife was present along with Jack Schaffer and his wife. At the time, Verdung was a member of the McHenry County board. Defendant stated that Chief Bill Moore was taking payoffs with regard to towing policies. Verdung testified that he did not believe defendant and did not believe the comment was very serious.

Bernard Borscha testified that he was the manager of Cary Autobody. Borscha had a conversation with defendant at the Cary Pub in March 1981. Greg Tricker was also present. Defendant stated that Borscha's boss and another man were paying off the chief, the cops in Cary, and the cops in McHenry County and that was why Cary Autobody was getting so many tow calls. Borscha told defendant he was crazy.

Dennis Keys, an officer with the Cary police department, testified

that he had a conversation with defendant in April 1981 at Streit's Auto Body shop. Keys remembered that other people were present but did not remember who they were. Defendant stated that certain officers in the police department were on the take. After Keys asked him what he meant, defendant stated that Chief Moore and certain unnamed other officers were taking money from Grove Standard with regard to the towing of vehicles involved in accidents or arrests. Defendant also questioned Keys as to where Moore was getting the money to buy certain personal property.

In July 1981, Keys had a conversation with defendant at the River Bend Restaurant in an unincorporated area near Cary. Defendant bought Keys a beer, and they began to talk. Defendant again told Keys that Moore and other Cary police officers were taking money and said he was going to prove it. Keys told defendant that he did not know what he was talking about and excused himself.

Over defendant's objection, the trial court admitted into evidence two statements purportedly given by Frank Romano to a Cary police officer in February 1982. Romano testified that he signed the February 8, 1982, statement which did not mention any allegedly slanderous remarks made by defendant. Romano testified that he was not sure if the signature appearing on the statement dated February 5, 1982, was his. In the latter statement, Romano purportedly related certain comments made by defendant at Whitey Hersh's home in November 1981 in the presence of Romano and Hersh. According to the written statement, defendant said that he knew the Cary cops were on the take from Grove Standard and Neeley and he just had to prove it. He also said that in other towns, the police chief gets a percentage of the tows, and he knows Chief Moore is getting his share. Defendant admitted to the others, according to this statement, that he had no evidence of payoffs and stated he was trying to discredit Chief Moore so that the village would set the towing policy instead of the chief. This would enable defendant to sue the village.

In addition to stating that he was not sure if the signature on the February 5, 1982, statement was his, Romano testified that he did not even know the meaning of some of the words attributed to him in the statement. Romano was never asked about the accuracy of any of the answers attributed to him in the statement, including those mentioning defendant's allegedly slanderous statements of November 1981. The officer who took the statement, Lieutenant David Burman, did testify, but was asked no questions about the statement.

A statement signed by Michael Knutson was admitted into evidence. Knutson testified that he gave the statement to a Cary police

officer on December 14, 1981. According to the statement, Knutson was standing in front of Streit's Auto Body on April 8, 1981, along with five other men. One of the men stated that Chief Moore was on the take. Knutson did not know who this man was at the time but found out later that it was defendant.

Knutson testified that he was chairman of the village police committee in 1981. He further testified that as of December 14, 1981, the date he gave the statement to the Cary officer, he had never met defendant. He now knew defendant very well and did not believe that defendant was the man who told him Chief Moore was on the take. Knutson stated that he originally thought that the man in question was defendant because after the man left the scene, Don Toomey, one of the other individuals who was present, stated that it was defendant.

Chief Moore testified that after defendant told him in May 1980 that some members of his department were taking payoffs with regard to towing, he ordered an internal investigation which turned up no evidence of wrongdoing. Moore stated that he had never taken a bribe. He also testified that in May 1983, an unknown individual left a sheet of paper on the desk of each village trustee which stated, "ATTENTION ANY COMMUNITY THAT TOLERATES A VENAL OR VICIOUS POLICE FORCE DESERVES TO BECOME ITS VICTIMS AND EVENTUALLY HAS MORE TO FEAR FROM ITS 'PROTECTORS' THAN ITS CRIMINAL PREDATORS." This document was admitted into evidence over plaintiffs' objection.

Defendant testified both as an adverse witness and on his own behalf. He denied making any of the statements attributed to him by plaintiffs' witnesses in which he allegedly accused Chief Moore and other Cary police officers of accepting payoffs.

After defendant rested, the trial court held an instructions conference. Defendant objected to each of the following three proposed instructions, which were given to the jury over his objection:

"Exemplary or punitive damages may be awarded where actual malice exists; however, the recovery of exemplary or punitive damages is not limited to cases of actual or express malice, but may be awarded on the basis of implied malice when the words published are actionable per se."

"Use of oral words imputing the commission of a crime is slanderous per se and damages need not be specifically pleaded and malice will be implied."

"When defamatory words are slanderous per se, the law will imply malice and such is presumed."

The jury found defendant liable, but awarded no actual damages. The jury did, however, award $6,500 in punitive damages to Chief Moore and $1,500 apiece in punitive damages to each of the other six plaintiffs. Defendant's post-trial motion was denied by the trial court. Defendant filed a timely notice of appeal.

■ The general rule in Illinois is that a party may not recover punitive damages in the absence of actual damages. (*McGrew v. Heinold Commodities, Inc.* (1986), 147 Ill. App. 3d 104, 110, 497 N.E.2d 424, 429; *Rhodes v. Uniroyal, Inc.* (1981), 101 Ill. App. 3d 328, 330, 427 N.E.2d 1380, 1382.) Defendant argues that the failure of the jury to award any actual damages precludes the awards of punitive damages. Plaintiffs respond by contending that in defamation actions, punitive damages may be awarded without any showing of actual damage if the statements giving rise to the cause of action are defamatory *per se* and were made with actual malice.

The above issue has been considered in two Illinois cases in which the courts reached opposite conclusions. In *Tunnell v. Edwardsville Intelligencer, Inc.* (1968), 99 Ill. App. 2d 1, 241 N.E.2d 28, *rev'd on other grounds* (1969), 43 Ill. 2d 239, 252 N.E.2d 538, the court upheld a jury verdict in a libel case in which plaintiff was given no award of actual damages but awarded $35,000 in punitive damages. The court cited the long-established rule that in cases involving statements which are defamatory *per se*, damage to reputation is presumed. (*Tunnell*, 99 Ill. App. 2d at 9, 241 N.E.2d at 32.) The court went on to state as follows:

> "To adopt the view that punitive damages in such defamation cases were dependent upon the allowance of actual damages, would be to allow a defamer some immunity because of the excellent reputation of the person defamed, and allow the defamer to become the beneficiary of the unassailable reputation of the one defamed." (99 Ill. App. 2d at 9, 241 N.E.2d at 32.)

The court held that if the language complained of is defamatory *per se*, a jury may award punitive damages in a defamation case without awarding actual damages. (99 Ill. App. 2d at 10, 241 N.E.2d at 32.) The Illinois Supreme Court reversed in *Tunnell* on the basis that the allegedly defamatory publication was not made with actual malice. *Tunnell*, 43 Ill. 2d at 247, 252 N.E.2d at 543.

In *Doss v. Field Enterprises, Inc.* (1975), 30 Ill. App. 3d 953, 332 N.E.2d 497, plaintiff filed a libel action because of an article published by defendant which linked him to organized crime. The court held that plaintiff could not recover because the article was covered by the privilege to report the acts and utterances of governmental bodies

and officials. (*Doss*, 30 Ill. App. 3d at 955, 332 N.E.2d at 499.) The court also noted that plaintiff's attorney admitted at one point during a hearing that plaintiff had not suffered any damage as a result of the article. The court stated that under the United States Supreme Court's holding in *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997, plaintiff would have to plead and prove that he suffered some actual damage in order to recover. *Doss*, 30 Ill. App. 3d at 955, 332 N.E.2d at 499.

The court held in *Gertz* that defamation plaintiffs who do not prove knowledge of falsity or reckless disregard for the truth may only recover damages which are sufficient to compensate them for actual injury. (*Gertz*, 418 U.S. at 349, 41 L. Ed. 2d at 811, 94 S. Ct. at 3012.) The Supreme Court subsequently held that *Gertz* only applied when the alleged defamatory speech involves a matter of public concern. (*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.* (1985), 472 U.S. 749, 761, 86 L. Ed. 2d 593, 603-04, 105 S. Ct. 2939, 2946.) The court did not explicitly hold in *Gertz*, as the *Doss* opinion seems to imply, that proof of actual damage is a requisite to recovery in all defamation cases involving public figures or matters of public concern.

The court did, however, use rather emphatic language in *Gertz* to warn of the potential negative impact of presumed and punitive damages upon the exercise of first amendment rights. With regard to presumed damages, the court stated as follows:

"Juries may award substantial sums as compensation for supposed damage to reputation without any proof that such harm actually occurred. The largely uncontrolled discretion of juries to award damages where there is no loss unnecessarily compounds the potential of any system of liability for defamatory falsehood to inhibit the vigorous exercise of First Amendment freedoms. Additionally, the doctrine of presumed damages invites juries to punish unpopular opinion rather than to compensate individuals for injury sustained by the publication of a false fact. More to the point, the States have no substantial interest in securing for plaintiffs such as this petitioner gratuitous awards of money damages far in excess of any actual injury." *Gertz*, 418 U.S. at 349, 41 L. Ed. 2d at 810-11, 94 S. Ct. at 3011-12.

The court stated as follows with regard to punitive damages:

"We also find no justification for allowing awards of punitive damages against publishers and broadcasters held liable under state-defined standards of liability for defamation. In most jurisdictions jury discretion over the amounts awarded is lim-

ited only by the gentle rule that they not be excessive. Consequently, juries assess punitive damages in wholly unpredictable amounts bearing no necessary relation to the actual harm caused. And they remain free to use their discretion selectively to punish expressions of unpopular views. Like the doctrine of presumed damages, jury discretion to award punitive damages unnecessarily exacerbates the danger of media self-censorship, but, unlike the former rule, punitive damages are wholly irrelevant to the state interest that justifies a negligence standard for private defamation actions. They are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence. In short, the private defamation plaintiff who establishes liability under a less demanding standard than that stated by New York Times may recover only such damages as are sufficient to compensate him for actual injury." *Gertz*, 418 U.S. at 350, 41 L. Ed. 2d at 811, 94 S. Ct. at 3012.

The above language from *Gertz* has led some courts from other jurisdictions to conclude that proof of actual damage is a constitutional requisite to recovery in a defamation action. (See, *e.g.*, *Schiavone Construction Co. v. Time, Inc.* (D.N.J. 1986), 646 F. Supp. 1511, 1519 (actual damage necessary in all defamation actions involving public figures or matters of public concern); *Memphis Publishing Co. v. Nichols* (Tenn. 1978), 569 S.W.2d 412, 419 (actual damage a requisite to recovery in all defamation actions).) Other courts have refused to read *Gertz* so broadly and have held that presumed and punitive damages may be awarded if actual malice as defined in the case of *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, is shown. See *Carson v. Allied News Co.* (7th Cir. 1976), 529 F.2d 206, 214 (applying Illinois law); *Continental Cablevision, Inc. v. Storer Broadcasting Co.* (D. Mass. 1986), 653 F. Supp. 451, 461 (applying Missouri law).

■ We believe that *Gertz* permits States to allow recovery of presumed and punitive damages in cases involving matters of public concern in the absence of any showing of actual damage if the defamatory statements were made with actual malice. The court stated in *Gertz*, "It is necessary to restrict defamation plaintiffs *who do not prove knowledge of falsity or reckless disregard for the truth* to compensation for actual injury." (Emphasis added.) (*Gertz*, 418 U.S. at 349, 41 L. Ed. 2d at 811, 94 S. Ct. at 3012.) The court also said, "[W]e hold that the States may not permit recovery of presumed or punitive damages, *at least when liability is not based on a showing of*

*knowledge of falsity or reckless disregard for the truth.*" (Emphasis added.) (418 U.S. at 349, 41 L. Ed. 2d at 810, 94 S. Ct. at 3011.) As the court noted in *Carson*, it can reasonably be implied from this language that if the actual malice standard set forth in *New York Times* is met, presumed and punitive damages may be awarded without any showing of actual damage. (*Carson*, 529 F.2d at 214.) Otherwise, the court could have explicitly held that presumed and punitive damages are unconstitutional in all defamation actions absent a showing of actual damage. *Continental Cablevision, Inc.*, 653 F. Supp. at 461.

In *Gertz*, the court gave little weight to the State interests advanced by the availability of presumed and punitive damages in defamation actions. The court gave greater weight to these interests more recently in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.* (1984), 472 U.S. 749, 86 L. Ed. 2d 593, 105 S. Ct. 2939. In *Dun & Bradstreet*, the court stated that the rationale of the common-law rules permitting awards of presumed and punitive damages in the absence of proof of actual damage in cases involving statements which are defamatory *per se* is that it will be impossible to prove actual damage in many cases where it is practically certain from the character of the defamatory statements and the circumstances of publication that damage occurred. (*Dun & Bradstreet*, 472 U.S. at 760, 86 L. Ed. 2d at 603, 105 S. Ct. at 2946.) The court stated further that allowing presumed damages "furthers the state interest in providing remedies for defamation by ensuring that those remedies are effective." (472 U.S. at 761, 86 L. Ed. 2d at 603, 105 S. Ct. at 2946.) It held that if the defamatory speech does not involve a matter of public concern, presumed and punitive damages may be awarded even if actual malice is not shown. 472 U.S. at 761, 86 L. Ed. 2d at 604, 105 S. Ct. at 2946.

While *Dun & Bradstreet* did not involve the same issue as the case at bar, we believe that the court's recognition of the State's interest in allowing presumed and punitive damages in some defamation actions is both relevant and significant with regard to this case. The court has recognized that in many instances, it is impossible to prove actual damage in a defamation action because of the intangible nature of one's reputation, even though the character of the defamatory statements makes it a virtual certainty that damage has occurred. (472 U.S. at 760, 86 L. Ed. 2d at 603, 105 S. Ct. at 2946.) The question presented here is whether first amendment concerns deny any possibility of recovery in such an instance, even when the defamatory statements are made with knowledge of their falsity or with reckless disregard for the truth.

The landmark case of *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, involved an advertisement which accused southern authorities of attempting to suppress the civil rights movement. The court framed the paramount issue of the case in the following manner:

> "The present advertisement, as an expression of grievance and protest on one of the major public issues of our time, would seem clearly to qualify for the constitutional protection. The question is whether it forfeits that protection by the falsity of some of its factual statements and by its alleged defamation of respondent." (*New York Times*, 376 U.S. at 271, 11 L. Ed. 2d at 701, 84 S. Ct. at 721.)

The court went on to hold that the first amendment precludes public officials from recovering damages for defamatory falsehoods relating to their official conduct unless they proved that the statements were made with actual malice, which the court defined as making an untrue statement with knowledge it was false or with reckless disregard of whether it was false or not. 376 U.S. at 279-80, 11 L. Ed. 2d at 706, 84 S. Ct. at 726.

In *New York Times*, the court recognized that erroneous statements were an inevitable by-product of free debate and that they needed to be constitutionally protected if first amendment freedoms of expression were to have the breathing space that was essential to their existence. (376 U.S. at 271-72, 11 L. Ed. 2d at 701, 84 S. Ct. at 721.) The court did not, however, afford such protection to erroneous statements made with knowledge of their falsity or with reckless disregard of whether they were false or not. In effect, the court answered the question it posed regarding whether statements about public officials and public issues lose their first amendment protection because they are false by concluding that they do not unless they are made with actual malice. It is therefore a fair inference from *New York Times* that defamatory statements made with actual malice are afforded little or no first amendment protection. Accordingly, we hold that the State's legitimate interest in providing effective remedies to plaintiffs in defamation actions by permitting the assessment of presumed and punitive damages for false statements made with actual malice which are defamatory *per se* outweighs the minimal first amendment protection afforded to false statements made with actual malice. We therefore decline to follow *Doss* and conclude that the absence of actual damage does not preclude plaintiffs from recovering punitive damages if the statements were defamatory *per se*, and defendant's liability was established under the *New York Times* actual malice standard.

■ Communications are considered defamatory *per se* if they are injurious on their face and impute matter falling within one of the following four categories: (1) the commission of a criminal offense; (2) infection with a communicable disease which would tend to exclude one from society; (3) inability to perform or want of integrity in the discharge of duties of office or employment; and (4) matter prejudicing a party in his profession or trade. (*Whitby v. Associates Discount Corp.* (1965), 59 Ill. App. 2d 337, 340-41, 207 N.E.2d 482, 484-85.) The rationale behind allowing presumed and punitive damages in the absence of proof of actual damage when a statement is defamatory *per se* is that the words are so obviously and naturally harmful to the plaintiff that proof of their injurious character can be dispensed with. *Costello v. Capital Cities Communications, Inc.* (1988), 125 Ill. 2d 402, 414, 532 N.E.2d 790, 795.

■ There is little doubt that the alleged defamatory statements fall into more than one of the above four categories. Acceptance of bribes by a police officer would appear to constitute a criminal offense under section 29A—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 29A—2). While imputation of the commission of a criminal offense is not defamatory *per se* unless the offense charged is indictable, involves moral turpitude, and is punishable by a term of imprisonment (*American Pet Motels, Inc. v. Chicago Veterinary Medical Association* (1982), 106 Ill. App. 3d 626, 629, 435 N.E.2d 1297, 1300), the crime of accepting a bribe meets each of these requisites. Furthermore, the alleged statements also impute a lack of integrity on the part of plaintiffs in the discharge of their duties as police officers and tend to prejudice them in their profession.

■ It is noteworthy, however, that none of the plaintiffs other than Chief Moore was specifically named by defendant in the alleged defamatory remarks. According to the testimony, defendant referred only to "the Cary cops," "some of the Cary cops," and "other Cary police officers" in addition to Chief Moore. In *Colucci v. Chicago Crime Comm'n* (1975), 31 Ill. App. 3d 802, 334 N.E.2d 461, the court stated that if an individual is not named in defamatory material, the material is not defamatory *per se* as to that person and special damages must be pleaded with particularity. (*Colucci*, 31 Ill. App. 3d at 810-11, 334 N.E.2d at 468.) While the court in *Colucci* did not discuss the reasoning behind this holding, it finds support in some of the general principles concerning defamation *per se* that we have already discussed. One of the requirements for matter to be considered defamatory *per se* is that it must be injurious on its face. (*Whitby*, 59 Ill. App. 2d at 340-41, 207 N.E.2d at 484-85.) A statement that does not

name an individual is not injurious to that person on its face. Additionally, as we have seen, the purpose behind presuming the existence of damage when statements are defamatory *per se* is that the words are so obviously and naturally harmful to plaintiff that proof of their injurious character can be dispensed with. (*Costello*, 125 Ill. 2d at 414, 532 N.E.2d at 795.) When an allegedly defamatory statement does not name a party but does refer to parties collectively, as in the instant case, "the Cary cops," "some of the Cary cops," and "other Cary police officers," the injurious character of the statement to those parties cannot be considered so obvious as to justify dispensing with proof of actual damages.

■ We therefore agree with the conclusion of the court in *Colucci* that a statement cannot be considered defamatory *per se* as to an individual unless the individual is named in the statement. Since Chief Moore was the only person named in defendant's alleged defamatory remarks, those statements were not slanderous *per se* as to the other six plaintiffs. Presumed damages are therefore not available to these plaintiffs, and the general rule that punitive damages cannot be awarded in the absence of actual damages applies to them. (See *Continental Nut Co. v. Robert L. Berner Co.* (7th Cir. 1968), 393 F.2d 283, 287 (applying Illinois law) (punitive damages may not be awarded in the absence of actual damages unless matter is defamatory *per se*).) Since the jury determined that these six plaintiffs suffered no actual damages, they are precluded from recovering punitive damages, and the punitive damage awards to them must be reversed.

■ With regard to Chief Moore, it is undisputed that, as a police officer, he must be considered a public official. (*Reed v. Northwestern Publishing Co.* (1988), 124 Ill. 2d 495, 508, 530 N.E.2d 474, 480.) The allegedly defamatory comments about Moore clearly involve matters of public concern since they relate to his integrity in the performance of his duties as chief of police. Under *Gertz*, Moore may therefore only recover punitive damages if defendant's liability was established under the *New York Times* standard. (*Gertz*, 418 U.S. at 350, 41 L. Ed. 2d at 811, 94 S. Ct. at 3012.) It is clear that under *New York Times*, actual malice must be proved and may not be presumed. (*New York Times*, 376 U.S. at 283-84, 11 L. Ed. 2d at 708-09, 84 S. Ct. at 728.) Furthermore, in *Gertz*, the court stated that punitive damages may not be recovered unless liability is based upon a *showing* of knowledge of falsity or reckless disregard for the truth. 418 U.S. at 349, 41 L. Ed. 2d at 810, 94 S. Ct. at 3011.

In three separate instructions, the trial court erroneously advised the jury that it could imply malice on the part of defendant under cer-

tain circumstances. One instruction stated that use of words imputing the commission of a criminal offense is slanderous *per se* and malice will be implied. Another stated that if defamatory words are slanderous *per se*, the law will imply malice and such is presumed. A third instruction stated that recovery of punitive damages "is not limited to cases of actual or express malice, but may be awarded on the basis of implied malice where the words published are actionable *per se.*" Since these instructions clearly advised the jury that it could presume malice if the allegedly defamatory statements were slanderous *per se* and award punitive damages on the basis of that presumption, the jury may have imposed liability under a less demanding standard than *New York Times*, which does not permit such presumptions. We must therefore reverse the punitive damage awards to Chief Moore and grant defendant a new trial with regard to the defamatory comments allegedly made about Moore.

The other issues raised have been waived because defendant failed to specifically raise them in his post-trial motion. (*Brown v. Decatur Memorial Hospital* (1980), 83 Ill. 2d 344, 348-49, 415 N.E.2d 337, 339.) We will briefly discuss two of these issues, however, since they may recur upon retrial. First of all, the three jury instructions which we have discussed, plaintiff's instructions Nos. 17, 20, and 23, should not be given upon retrial because they improperly permit a presumption of malice if the defamatory language was slanderous *per se*, a presumption which *New York Times* does not permit in cases involving public officials.

■ Secondly, the anonymous flyer left on the desk of each village trustee in 1983 warning of the dangers of "a venal or vicious police force" should not have been admitted into evidence at the original trial. Evidence must be material in order to be admissible. (*O'Brien v. Walker* (1977), 49 Ill. App. 3d 940, 952, 364 N.E.2d 533, 541.) Evidence is material if it is offered to prove a proposition that is a matter of controversy in the case or has probative value with regard to a contested issue. (*Joynt v. Barnes* (1979), 71 Ill. App. 3d 187, 199, 388 N.E.2d 1298, 1307.) Since there was no evidence connecting defendant in any way to the flyer, it sheds no light upon the primary matter in controversy, whether defendant made the allegedly defamatory statements. The only contested matter to which the flyer could be relevant is damages since it could arguably indicate that the reputation of the Cary police department was poor. There was no evidence, however, tending to show that the accusations purportedly made by defendant led to the issuance of the flyer. It is therefore possible that the flyer had no relation to the accusations allegedly made by defend-

ant. The flyer was thus immaterial and should not have been admitted into evidence. Unless plaintiff Moore produces evidence connecting the flyer to defendant or defendant's alleged accusations, it should not be admitted upon retrial.

For reasons previously stated, we reverse the judgment of the circuit court of McHenry County awarding punitive damages to the six plaintiffs other than Chief Moore. We also reverse the award of punitive damages to Moore but, in his case only, remand the cause for a new trial.

Reversed and remanded.

REINHARD and NASH, JJ., concur.