[Civ. No. 42705. First Dist., Div. Two. Feb. 14, 1980.]

SAUL M. WEINGARTEN, Plaintiff and Appellant, v.
PAUL BLOCK et al., Defendants and Respondents.

COUNSEL

Jacque Boyle for Plaintiff and Appellant.

Noland, Hamerly, Etienne & Hoss, Myron E. Etienne, Jr., and Michael D. Cling for Defendants and Respondents.

OPINION

TAYLOR, P. J.—The major questions presented by this appeal[1] are whether the trial court properly: 1) found that plaintiff, Saul M. Weingarten (Weingarten), the former City Attorney of Seaside and local attorney for its redevelopment agency, was a "public official" and "public figure" within the rule of *New York Times Co. v. Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412], and *Curtis Publishing Co. v. Butts* (1967) 388 U.S. 130 [18 L.Ed.2d 1094, 87 S.Ct. 1975]; 2) granted a nonsuit at the conclusion of Weingarten's evidence before a jury on his complaint for libel, conspiracy to libel, intentional infliction of emotional distress, and interference with economic advantage against the owners and publishers of the Monterey Peninsula Herald and other defendants[2] (hereafter collectively Block). For the reasons set forth below, we have concluded that the judgment must be affirmed.

The instant case hinges on the application of the qualified constitutional privilege based on the First Amendment of the United States Constitution and extended to state court libel actions by the Fourteenth Amendment, as first set forth in *New York Times Co. v. Sullivan, supra*, 376 U.S. 254. The rule established that in a defamation action brought by a public official, the plaintiff must prove by clear and convincing evidence that the publication was false, and that the defendant published with "actual malice" (p. 280 [11 L.Ed.2d at p. 706]), defined as publishing "with knowledge that it was false or with reckless disregard of whether it was false or not" (p. 280 [11 L.Ed.2d at p. 706]). (See also *Cox Broadcasting Corp. v. Cohn* (1975) 420 U.S. 469, 490 [43 L.Ed.2d 328, 346, 95 S.Ct. 1029]).

The New York Times rule was extended beyond "public officials" to "public figures" (*Curtis Publishing Co. v. Butts, supra*, 388 U.S. 130, and its companion case, *Associated Press v. Walker* (1967) 388 U.S. 130 [18 L.Ed.2d 1094, 87 S.Ct. 1975]). In *Rosenbloom v. Metromedia* (1971) 403 U.S. 29 [29 L.Ed.2d 296, 91 S.Ct. 1811], the United States Supreme Court held that a libel plaintiff's status as a public person was

---

[1]The notice of appeal indicates that it is also taken from the order of November 24, 1976, which granted the defense motion for a court determination of the application of the New York Times privilege. As this order was merged in the judgment, it is not separately appealable and that appeal must be dismissed.

[2]The defendants on appeal are Paul Block, the major stockholder; Toledo Blade Company, another owner; Monterey Peninsula Herald Company, the publisher, B. Gifford, the manager of the Monterey Herald; and M. Jaques, the author of the articles.

not determinative of the availability of the qualified constitutional privilege; the privilege was extended to all discussion and communication concerning matters of public or general concern. Subsequently, in *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323 [41 L.Ed.2d 789, 94 S.Ct. 2997], the United States Supreme Court held that the *Rosenbloom* rule was not constitutionally required, and returned to a distinction between "public persons" (including both "public officials" and "public figures") and "private individuals."

■ Preliminarily, we dispose of Weingarten's procedural contentions. Weingarten argues that the court abused its discretion by permitting Block to amend their answers at the time of trial to include an allegation that he was a "public official." The answers alleged as an affirmative defense that Weingarten was a "public figure." ■ The trial court has discretion to allow an amendment to any pleading in furtherance of justice at any time before or after the commencement of trial (Code Civ. Proc., §§ 473, 576). Liberality in permitting amendments is the rule (*Greenberg* v. *Equitable Life Assur. Society* (1973) 34 Cal.App.3d 994 [110 Cal.Rptr. 470]). As a matter of policy, the ruling of the trial court will be upheld, unless a manifest or gross abuse of discretion is shown (*Bedolla* v. *Logan & Frazer* (1975) 52 Cal.App.3d 118, 135 [125 Cal.Rptr. 59]).

■ As the court observed here, Weingarten knew from the beginning that the New York Times privilege was the major issue. Weingarten's complaint was pled in the language of New York Times and in his trial brief, he referred to himself as a "public official." Accordingly, we conclude that the court did not abuse its discretion in allowing the amendment of the answer.

■ Weingarten next argues that the trial court erred by making a determination of the public official/public figure issue prior to the commencement of the jury trial. In *Rosenblatt* v. *Baer* (1966) 383 U.S. 75, at page 88 [15 L.Ed.2d 597, 606, 86 S.Ct. 669], the United States Supreme Court indicated that "as is the case with questions of privilege generally, it is for the trial judge in the first instance to determine whether the proofs show [plaintiff] to be a 'public official.'" The federal authorities agree that the question is a mixed one of law and fact to be preliminarily determined by the trial court (*Meeropol* v. *Nizer* (2d Cir. 1977) 560 F.2d 1061 [195 U.S.Pat.Q. 273]; *Rosanova* v. *Playboy Enterprises, Inc.* (S.D.Ga. 1976) 411 F.Supp. 440; *Hotchner* v. *Castillo-*

*Puche* (S.D.N.Y. 1975) 404 F.Supp. 1041; revd. jury verdict (2d Cir. 1977) 551 F.2d 910). Such a procedure is consistent with that followed in this state for the determination of privilege. In any event, Evidence Code section 320 leaves the order of proof in the discretion of the trial court "[e]xcept as otherwise provided by law." We conclude that the trial court properly determined the issue before submitting the case to the jury.

In this context, we turn to the facts as found[3] by the court.

Weingarten served as city attorney for the City of Seaside for 15 years, from 1955 to 1970; he also served as city attorney for the City of Gonzales for 19 years, from 1954 to 1973, and as interim city attorney for the City of Pacific Grove for one year, from 1954 to 1955. In addition, Weingarten has served continuously as attorney for the Redevelopment Agency of the City of Seaside (Redevelopment Agency) from 1963 through 1977. Although the Redevelopment Agency was served by other counsel, Weingarten has been the only local counsel. Weingarten was the City Attorney of Seaside at the time the Redevelopment Agency was formed and was instrumental in forming the agency, in getting the federal funding and initiating and bringing to fruition a series of redevelopment projects in the city. Since the formation of the City of Seaside in the mid-1950's, Redevelopment Agency has played an important role in providing utilities, improvements and services which did not exist in Seaside prior to its incorporation. Weingarten has played an active and important role in the Redevelopment Agency since its inception in 1963, and has received much publicity concerning his role in the Redevelopment Agency throughout its history.

Prior to publication of the subject articles[4] in 1971, Weingarten was a member of the Democratic Central Committee for Monterey County

[3]As findings of fact are not necessary on a nonsuit (*Mosk* v. *Scheinberg* (1942) 52 Cal.App.2d 154, 157 [125 P.2d 872]), we treat the findings as pertaining to the court's pretrial determination that Weingarten was a public official and a public figure. We also need not discuss in detail Weingarten's contention that the court abused its discretion in filing the findings after the judgment. The record indicates that Weingarten made no objection to the proposed findings and conclusions. The judgment was entered on January 18, 1977; the findings and conclusions on February 11, nunc pro tunc as of January 18, 1977. The court had authority to do so and Weingarten was not prejudiced thereby (*Norton* v. *City of Pomona* (1935) 5 Cal.2d 54, 62-63 [53 P.2d 952]; *Kaliterna* v. *Wright* (1949) 94 Cal.App.2d 926, 935 [212 P.2d 32]; Code Civ. Proc., § 473).

[4]The publications involved are the story published on September 9, 1971, set forth in appendix A; the editorial on September 14, 1971, quoted in footnote 6 below, and the brief news story concerning Weingarten's taxes published on October 1, 1971. As the court conceded that the latter contained no defamatory material we need not quote it.

for approximately 10 years, and a member of the State Central Committee for 2 years. In 1958, Weingarten was a candidate for the public office of State Assembly and his name was suggested by Democratic organizations as a candidate for the United States Congress and the California State Senate.

Weingarten pled in his fifth amended complaint that he was "public attorney." His activities as city attorney, attorney for the Redevelopment Agency, and civic leader in the community of Seaside and in the Monterey peninsula area received extensive publicity in the Monterey Peninsula Herald newspaper from 1967 to 1971. Because of his public stature, Weingarten had significantly greater access to the channels of communication than does an ordinary private person.

At the time of the publication of the subject articles in 1971, Weingarten had assumed a role of especial prominence in the affairs of the community of Seaside, and occupied a position of persuasive fame and notoriety in the community of Seaside. Weingarten was discharged from his position as city attorney for the City of Seaside in October 1970 by vote of the Seaside City Council. Thereafter, he served as the attorney for the Seaside Citizens for Better Government, a corporation organized to initiate a recall of the members of the Seaside City Council who had voted for his discharge. In relation to the recall movement in Seaside, Weingarten also represented Bernard J. Dolan, Jr., in an action filed against the City of Seaside in Monterey County Superior Court, No. M 5020, entitled Dolan v. City of Seaside. The recall movement in Seaside generated public controversy in the community and received extensive publicity in the local newspaper.

The recall movement, organized and promoted by the corporation which Weingarten represented, successfully recalled from office three of four members of the Seaside City Council who had voted to discharge him. By his representation of the recall organization, Weingarten voluntarily injected himself into a public controversy in Seaside regarding the recall election and thereby invited public attention and comment.

After the discharge of Weingarten from the position of city attorney in October 1970, that position remained vacant and legal services were performed for Seaside by several interim city attorneys. In August of 1971, after completion of the recall election, the City of Seaside resumed its search for a city attorney. On August 5, 1971, an article

appeared in the Monterey Peninsula Herald indicating that the Seaside City Council was resuming the search for a city attorney. On September 9, 1971, the date of the publication of the first subject article, the Seaside City Attorney position was vacant and applications for the position were being solicited by the City of Seaside. The position of city attorney in Seaside was a matter of lively public interest throughout 1971 and remained so on September 9, 1971. Propositions for further change were abroad, and public interest in filling the vacancy created by the firing of Weingarten continued strong throughout 1971.

Weingarten was drawn into the public controversy in Seaside regarding the filling of the vacancy in the city attorney position because of his former position as Seaside City Attorney for 15 years, and because of his involvement as attorney for the organization which recalled 3 of the 4 members of the Seaside City Council who had voted to discharge him.

The comments about Weingarten which appeared in the subject articles relate to the following issues: 1) Weingarten's involvement in the public controversy surrounding his dismissal as city attorney and the filling of the vacancy created thereby; 2) Weingarten's involvement in the movement to recall the members of the Seaside City Council who voted to discharge him; 3) Weingarten's fitness to perform the services of City Attorney of the City of Seaside or attorney for the Redevelopment Agency.

The above findings were supported by substantial evidence. The court took judicial notice of a voluminous file of newspaper articles concerning the Seaside City Council and Weingarten from 1968 to 1971.

In *Rosenblatt* v. *Baer, supra,* 383 U.S. 75, which involved the former supervisor[5] of a county recreation area, the United States Supreme Court, at page 84 [15 L.Ed.2d at p. 604], rejected state law standards as the basis for determining who is a public official. The court then indicated, at page 85 [15 L.Ed.2d at p. 605], that it need not precisely define the term for the purpose of that case, and then stated at pages 85-86, and 87 [15 L.Ed.2d at pages 605-606]: "The motivating force for the decision in *New York Times* was twofold. We expressed 'a pro-

---

[5]The court, at pages 87-88 [15 L.Ed.2d at pages 606-607], acknowledged that the plaintiff might be a public official but reserved the question for the trial court if a retrial were sought. In *Henry* v. *Collins* (1965) 380 U.S. 356 [13 L.Ed.2d 892, 85 S.Ct. 992], a per curiam opinion, the United States Supreme Court assumed that one of the defendants, a county attorney, was a "public official" within the New York Times rule.

found national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, *and* that [such debate] may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' 376 U.S., at 270. (Emphasis supplied.) There is, first, a strong interest in debate on public issues, and, second, *a strong interest in debate about those persons who are in a position significantly to influence the resolution of those issues.* Criticism of government is at the very center of the constitutionally protected area of free discussion. *Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized.* It is clear, therefore, that *the 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs.*

"This conclusion does not ignore the important social values which underlie the law of defamation. Society has a pervasive and strong interest in preventing and redressing attacks upon reputation. But in cases like the present, there is tension between this interest and the values nurtured by the First and Fourteenth Amendments. The thrust of *New York Times* is that when interests in public discussion are particularly strong, as they were in that case, the Constitution limits the protections afforded by the law of defamation. *Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, both elements we identified in New York Times are present*[12] *and the New York Times malice standards apply.*[13]" (Italics partially added.)

---

"[12]We are treating here only the element of public position, since that is all that has been argued and briefed. We intimate no view whatever whether there are other bases for applying the *New York Times* standards—for example, that in a particular case the interests in reputation are relatively insubstantial, because the subject of discussion has thrust himself into the vortex of the discussion of a question of pressing public concern. Cf. *Salinger* v. *Cowles,* 195 Iowa 873, 889, 191 N.W. 167, 173-174 (1922); *Peck* v. *Coos Bay Times Publishing Co.,* 122 Ore. 408, 420-421, 259 P. 307, 311-312 (1927); *Coleman* v. *MacLennan,* 78 Kan. 711, 723-724, 98 P. 281, 285-286 (1908); *Pauling* v. *News Syndicate Co.,* 335 F.2d 659, 671 (C. A. 2d Cir. 1964)."

"[13]It is suggested that this test might apply to a night watchman accused of stealing state secrets. But a conclusion that the *New York Times* malice standards apply could not be reached merely because a statement defamatory of some person in government employ catches the public's interest; that conclusion would virtually disregard society's interest in protecting reputation. *The employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy.*"

In *Gertz v. Robert Welch, Inc., supra*, 418 U.S. 323, the court, in distinguishing between private and public individuals, observed at pages 344-345 [41 L.Ed.2d at page 808]: "Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy. Private individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater.

"More important than the likelihood that private individuals will lack effective opportunities for rebuttal, there is a compelling normative consideration underlying the distinction between public and private defamation plaintiffs. *An individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case. And society's interest in the officers of government is not strictly limited to the formal discharge of official duties.* As the Court pointed out in *Garrison v. Louisiana*, 379 U.S. 64, 77, *the public's interest extends to 'anything which might touch on an official's fitness for office. . . .* Few personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation, even though these characteristics may also affect the official's private character.'" (Italics added.)

■ Weingarten's activities, set forth in the findings summarized above, indicate all of the *Rosenblatt* and *Garrison* criteria were met. As city attorney and attorney for the Redevelopment Agency, he had substantial control over the conduct of governmental affairs of Seaside. After his discharge and the recall, the public had an independent interest in anything that might touch on his fitness for that office and his continued services to the Redevelopment Agency.[6] Needless to say, these included his involvements in matters relating to real property and whether or not he had misused either public trust for his own benefit or that of his personal clients. We conclude that an appropriate balancing of freedom of expression against sanctity of reputation in the instant case requires the conclusion reached by the trial court, namely, that Weingarten was a "public official" within the meaning of *New York Times* and *Rosenblatt*, both *supra*.

---

[6]This was the thrust of Block's following editorial published on September 14, 1971:

We note that the authorities in other jurisdictions agree that city attorneys or attorneys performing similar duties are "public officials" for the purpose of the *New York Times* rule (*Finkel* v. *Sun Tattler Co., Inc.* (Fla.App. 1977) 348 So.2d 51 (former city attorney); *Frink* v. *McEldowney* (1971) 29 N.Y.2d 720 [325 N.Y.S.2d 755, 275 N.E.2d 337] (attorney employed by a town to render legal opinions on matter of town interest); *Tunnell* v. *Edwardsville Intelligencer, Inc.* (1968) 99 Ill.App.2d 1 [241 N.E.2d 28], revd. on other grounds, 43 Ill.2d 228 [252 N.E.2d 538]; *Ewald* v. *Roelofs* (1970) 120 Ill.App.2d 30 [256 N.E.2d 89] (municipal attorney conceded the issue)).[7]

---

### "THE WEINGARTEN CASE OUT IN THE OPEN

"THE point-by-point revelation in last Thursday's Herald of the prolific real estate and legal practice maneuverings of former Seaside City Atty. Saul M. Weingarten should prompt that city's urban redevelopment agency — which continues to retain him as counsel — to reflect on the type of advice it may be getting.

"In all fairness to Weingarten, he has been credited with helping direct some of Seaside's major accomplishments in making the difficult transition from a World War II boom town into an orderly residential city. But while Saul Weingarten was being good to Seaside, Seaside certainly was being good to Saul Weingarten.

"During his 15 years of part-time public service, according to The Herald's examination of the record, he amassed a fortune valued at $1.5 million. He earned more than $50,000 in some years from his public employment as both city attorney and legal counsel for the redevelopment agency. The redevelopment plum alone has paid more than $41,000 a year.

"During all this profitable period, Weingarten was working his way in and out of various legal predicaments involving charges of negligence, malpractice and fraud from which he never has been completely exonerated.

"It was this questionable record and other dubious activities that finally provoked the former city council of Seaside to fire him as city attorney. In retrospect, the published record certainly vindicates the wisdom of that council's action.

"But incomprehensible as it may seem, the urban redevelopment agency — whose members are appointed by one of Weingarten's legal clients, Mayor Lou Haddad — has never seen fit to do anything about the recurring difficulties in which their chief adviser is from time to time involved.

"The fact that Weingarten's brushes were civil rather than criminal might work in his behalf were it not that the complaints against him so directly reflect upon his integrity as a public attorney. The fact remains that Seaside's important urban redevelopment program is officially represented by an attorney whose standard of ethics has been tried and found badly wanting.

"Whatever the agency does at this late date, it will not be able to eradicate the sorry public record of this case, which is now completely out in the open. In most cities, a record similar to Weingarten's would have been cause for immediate dismissal, or at least suspension.

"In Seaside, so far, only four city councilmen had the courage to do anything about this mess — and three of them were subsequently repudiated at the polls for their judgment."

[7]*Zeck* v. *Spiro* (1966) 52 Misc.2d 629 [276 N.Y.S.2d 395], the only contrary authority (attorney for a sewer district not a public official) turned on the finding that the statement did not involve official conduct rather than the status of the individual.

█ As since the filing of the briefs in this case the U.S. Supreme Court decided *Wolston v. Reader's Digest Assn., Inc.* (1979), 443 U.S. 157 [61 L.Ed.2d 450, 99 S.Ct. 2701] and *Hutchinson v. Proxmire* (1979) 443 U.S. 111 [61 L.Ed.2d 411, 99 S.Ct. 2675] (both decided June 26, 1979), we are constrained to discuss the question of whether Weingarten also was a "public figure." The basis for the extension of the New York Times privilege to the libel claims of public figures was stated in the plurality opinion in *Curtis Publishing Co. v. Butts, supra,* 388 U.S., pages 147-148 [18 L.Ed.2d page 1107], as follows: "From the point of view of deciding whether a constitutional interest of free speech and press is properly involved in the resolution of a libel question a rational distinction 'cannot be founded on the assumption that criticism of private citizens who seek to lead in the determination of . . . policy will be less important to the public interest than will criticism of government officials.' *Pauling v. Globe-Democrat Publishing Co.*, 362 F.2d 188, 196."

In his concurring opinion, Chief Justice Warren said: "Viewed in this context, then, it is plain that although they are not subject to the restraints of the political process, 'public figures,' like *'public officials,' often play an influential role in ordering society. And surely as a class these 'public figures' have as ready access as 'public officials' to mass media of communication, both to influence policy and to counter criticism of their views and activities. Our citizenry has a legitimate and substantial interest in the conduct of such persons, and freedom of the press to engage in uninhibited debate about their involvement in public issues and events is as crucial as it is in the case of 'public officials.' The fact that they are not amenable to the restraints of the political process only underscores the legitimate and substantial nature of the interest, since it means that public opinion may be the only instrument by which society can attempt to influence their conduct*" (p. 164 [18 L.Ed.2d p. 1116]). (Italics added.)

In *Gertz v. Robert Welch, Inc., supra,* 418 U.S. 323, the court noted at page 345 [41 L.Ed.2d at page 808]: "Those classed as public figures stand in a similar position. Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed

public figures for all purposes. *More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.* In either event, they invite attention and comment" (italics added).

The facts as found by the trial court here indicate that Weingarten thrust himself to the forefront of the public controversy[8] that arose around his termination and was actively involved in influencing its resolution by his involvement in the recall and his continuing representation of the Redevelopment Agency as its chief local counsel. By such voluntary and active participation, he relinquished his interest in the protection of his own name.[9] Further here, since Weingarten earned substantial amounts from his public assignments, there was sufficient concern about specific public expenditures to make him a public figure. *Hutchinson* v. *Proxmire, supra,* 443 U.S. 111 [61 L.Ed.2d 411], is therefore inapposite. In Hutchinson, a scientist who engaged in federally funded research received the "Golden Fleece Of The Month" award bestowed by a United States Senator. In rejecting a contention that Hutchinson was a limited purpose public figure, the court said at page 135 [61 L.Ed.2d at page 431]: "Hutchinson did not thrust himself or his views into public controversy to influence others. Respondents have not identified such a particular controversy; at most, they point to concern about general public expenditures. But that concern is shared by most and relates to most public expenditures; it is not sufficient to make Hutchinson a public figure. If it were, everyone who received or benefited from the myriad public grants for research could be classified as a

[8]*Wolston* v. *Reader's Digest Assn., Inc., supra,* 443 U.S. 157 [61 L.Ed.2d 450], is distinguishable. Wolston, who had been interrogated about the activities of Soviet intelligence agents in the United States, failed to respond to a grand jury subpoena, subsequently pled guilty to contempt charges, and was sentenced. These proceedings received considerable newspaper publicity but Wolston then returned to relative obscurity until 15 years later when a publisher named him as a Soviet agent. In holding that Wolston was not a public figure, the United States Supreme Court said at page 167 [61 L.Ed.2d at page 460]: "Petitioner's failure to appear before the grand jury and citation for contempt no doubt were 'newsworthy,' but the simple fact that these events attracted media attention also is not conclusive of the public figure issue. A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention."

[9]We agree with the view recently expressed by Division One of this court in *Franklin* v. *Benevolent etc. Order of Elks* (1979) 97 Cal.App.3d 915, at pages 928-930 [159 Cal.Rptr. 131], that the broader definition previously suggested by this court in *Montandon* v. *Triangle Publications, Inc.* (1975) 45 Cal.App.3d 938, 948 [120 Cal.Rptr. 186, 84 A.L.R.3d 1234], has been superseded by *Gertz, supra,* 418 U.S. 323, *Time, Inc.* v. *Firestone* (1976) 424 U.S. 448 [47 L.Ed.2d 154, 96 S.Ct. 958], and *Wolston, supra.*

public figure—a conclusion that our previous opinions have rejected. The 'use of such subject-matter classifications to determine the extent of constitutional protection afforded defamatory falsehoods may too often result in an improper balance between the competing interests in this area.' *Time, Inc.* v. *Firestone, supra,* at 456 [47 L.Ed.2d 154, 96 S.Ct. 958]."

We hold that the trial court also properly concluded that Weingarten was a public figure.

■ Next, we turn to Weingarten's contention that the trial court applied the wrong standard in granting the nonsuit. He asserts that following the concurring opinion of Justice Wright in *Wasserman* v. *Time, Inc.* (D.C. Cir. 1970) 424 F.2d 920 (cert. den. 398 U.S. 940 [26 L.Ed.2d 273, 90 S.Ct. 1844]), the trial court judged the credibility of witnesses and drew its own inferences from the evidence. The record, however, indicates that the court followed the more stringent rule of *Guam Federation of Teachers, Local 1581, A.F.T.* v. *Ysrael* (9th Cir. 1974) 492 F.2d 438, which held that all inferences must be drawn in favor of the plaintiff.

We acknowledge that the *Wasserman* rule was followed in *Bon Air Hotel, Inc.* v. *Time, Inc.* (5th Cir. 1970) 426 F.2d 858, 864-865. However, we find the reasoning of the Ninth Circuit persuasive. Justice Duniway said in *Guam Federation, supra,* at page 441: "When civil cases may have a chilling effect on First Amendment rights, special care is appropriate. Thus, a judicial examination at these stages of the proceeding, closely scrutinizing the evidence to determine whether the case should be terminated in a defendant's favor, provides a buffer against possible First Amendment interferences. The Supreme Court has instructed trial courts to 'examine for [themselves] the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment . . . protect.' To be unprotected, actual malice must be shown with 'convincing clarity.' *New York Times, supra,* 376 U.S. at 285-286, 84 S.Ct. at 728-729.

"However, with respect, we are not persuaded by the second phase of Judge Wright's analysis in *Wasserman* which suggests that in deciding these motions, the trial court should judge the credibility of witnesses and draw its own inferences from the evidence. We think that in a libel case, as in other cases, the party against whom a motion for summary

judgment, a motion for a directed verdict, or a motion for a judgment notwithstanding the verdict is made is entitled to have the evidence viewed in the light most favorable to him and to all inferences that can properly be drawn in his favor by the trier of fact. We think, too, that in such cases it is not only not the duty of the judge, or of this court of appeal, to weigh the credibility of the evidence, or to draw inferences in favor of the moving party (except, of course, when no contrary inference can legitimately be drawn), but that neither the judge nor this court on appeal has the authority to weigh credibility or to choose among legitimate inferences in such cases.

"The *standard* against which the evidence must be examined is that of *New York Times* and its progeny. But the *manner* in which the evidence is to be examined in the light of that standard is the same as in all other cases in which it is claimed that a case should not go to the jury."

As the Ninth Circuit rule is also in accord with the usual rule followed in this state for nonsuits, we conclude that the trial court applied the correct standard.

█ Weingarten concedes that he must prove not only that the publication was false but that it was knowingly so or was circulated with reckless disregard for its truth or falsity (*Cox Broadcasting Corp.* v. *Cohn, supra,* 420 U.S., p. 490 [43 L.Ed.2d, p. 346]), by clear and convincing evidence (*New York Times* v. *Sullivan, supra,* 376 U.S. 254).

"Reckless disregard 'cannot be fully encompassed in one infallible definition'; rather, 'its outer limits [must] be marked out through case-by-case adjudication, . . . .' (*St. Amant* v. *Thompson, supra,* 390 U.S. 727, 730 [20 L.Ed.2d 262, 267].) It is clear, however, that it involves a stringent and subjective standard. It is not measured by whether a reasonably prudent person would have published, or would have investigated before publishing. Rather, there must be sufficient evidence to permit an inference that the defendant must have, in fact, subjectively entertained serious doubts as to the truth of his statement. (*St. Amant* v. *Thompson, supra,* 390 U.S. at p. 731 [20 L.Ed.2d at p. 267]; *Alioto* v. *Cowles Communications, Inc., supra,* 519 F.2d 777, 779; *Montandon* v. *Triangle Publications, Inc.* (1975) 45 Cal.App.3d 938, 947 [120 Cal.Rptr. 186], cert. den., 423 U.S. 893 [46 L.Ed.2d 126, 96 S.Ct. 193].) Actual malice, under *New York Times,* concentrates on the de-

fendant's attitude toward the truth or falsity of the material published, and does not focus on the defendant's attitude toward the plaintiff. (*Cantrell* v. *Forest City Publishing Co.* (1974) 419 U.S. 245, 251-252 [42 L.Ed.2d 419, 426, 95 S.Ct. 465]; *Carson* v. *Allied News Co., supra,* 529 F.2d 206, 214.) Where the defamatory statements made by the defendant do not involve an element of 'hot news' and the need for expeditious release is not present, reckless disregard for the truth may be evidenced in part by failure to investigate thoroughly and verify the facts." (*Widener* v. *Pacific Gas & Electric Co.* (1977) 75 Cal.App.3d 415, 434 [142 Cal.Rptr. 304].)

Viewing the record in favor of Weingarten in the light of his burden of proof as to Block's attitude toward the truth or falsity of the material published, the following pertinent facts appear: Block actively took over management of the Herald around August 1970, and changed the editorial staff. After the change, the Herald opposed the recall.

L. N. Haddad, who was the Mayor of Seaside from 1966 to 1972, testified that in 1970, before Weingarten was fired as city attorney, he was contacted by Block. Block wanted to know why Haddad had so strongly defended Weingarten, and urged Haddad to join the other members of the city council and fire Weingarten as city attorney.

Block had become aware of Weingarten and his activities after conversations with people in Seaside and after receiving letters from Oliver Murray, one of the recalled city council members. Block also received copies of some of the documents in *Parker* v. *Weingarten.* In this matter,[10] Mrs. Parker was awarded damages for breach of trust and malpractice as Weingarten's actions caused her to lose her $4,045 equity in a parcel of real property. She had sought his help to prevent foreclosure. Weingarten arranged the refinancing which included a $5,000 third deed of trust at 10 percent interest to Allnav, Inc., a real estate investment group. Weingarten was a founder and shareholder of Allnav, acted as its attorney, and became the trustee under the third deed of trust. He did not reveal his interest in, and activities for, Allnav to Mrs. Parker. In the transaction, he also acted as trustee for both Mrs. Parker and her son, although their interests were adverse. After a court trial awarding Mrs. Parker $21,301.78, she consented to a reduction to $12,880 to avoid a conditional order granting a new trial; the

[10]We have based our summary on the unpublished opinion of this court which slightly modified and affirmed the reduced judgment in favor of Mrs. Parker on November 4, 1969; the state Supreme Court subsequently denied a hearing.

reduction eliminated $3,421.78 general damages and $5,000 exemplary damages for fraud. The case received extensive publicity at all stages and apparently was one of the factors that led to Weingarten's termination as city attorney.

Block requested that a reporter be sent on a special assignment from another of its papers, the Pittsburgh Press, which was then on strike. M. Jaques, a reporter with over 25 years of experience, arrived in Monterey late in the summer of 1971 and spent a month investigating the matter before deciding to write an article. He researched court records, deeds, the Seaside city budget, Redevelopment Agency records, the Monterey County Grantor-Grantee Index, the financial statements and records of Allnav Corporation, the Monterey Superior Court files, and the Herald "morgue."

In addition to the city manager, city officials and the recalled council members, Jaques talked to Mr. Hoss, who had represented Mrs. Parker, and one of Hoss's partners, Mr. Etienne. Jaques also interviewed: 1) Mrs. Schacht, who was the adverse party in another publicized case in which Weingarten was the defendant after he represented her former husband; 2) some of the dissident shareholders of Allnav who disagreed with Weingarten about its management and succeeded in dissolving the corporation; 3) the black plaintiff in a housing discrimination action in which Weingarten represented the oriental defendants; 4) Mrs. Charbonneau whose sale of her property to the Redevelopment Agency was delayed because Weingarten had an unrecorded deed to the property obtained in a judgment against the former owner.

Fred Sorri, who was city editor of the Herald for one and one-half years and had been a reporter since 1955, was asked to give Jaques some background on Weingarten. Sorri indicated that Weingarten had done a good job and never lost a case for the city, survived all of the controversies with the city council, and was involved in the unpopular activity of obtaining property by eminent domain for the Redevelopment Agency. When Sorri indicated that Weingarten should be interviewed, Mr. Block said "No." In reply to a question on direct examination,[11] Sorri stated that Jaques had been brought out as a "hatchet man" for Block on the Weingarten story but he immediately qualified his answer to indicate that Block would not have brought Jaques out if Block had not had good reason to believe (from sources unknown to

[11]Sorri was a witness for Weingarten.

Sorri) that there was a story. Sorri's testimony thus established Block's lack of malice toward Weingarten. Sorri's statement that there was no "hot news element" or "news hook" to the September 9, 1971, story, is also of little consequence, given the thorough and lengthy investigation conducted by Jaques.

Nor, contrary to Weingarten's contention, was there any requirement that Jaques also talk to him to obtain his version of the events described. *Rosenbloom* v. *Metromedia, supra,* 403 U.S. 29, specifically so held at page 56 [29 L.Ed.2d 296, at page 319]. Jaques was also not required to provide an objective picture (*New York Times Company* v. *Connor* (5th Cir. 1966) 365 F.2d 567, 576). Inaccuracies in reporting judicial proceedings do not constitute actual malice (*Time, Inc.* v. *Pape* (1971) 401 U.S. 279 [28 L.Ed.2d 45, 91 S.Ct. 633]). Factual error alone, also will not suffice (*Fadell* v. *Minneapolis Star & Tribune Co., Inc.* (7th Cir. 1977) 557 F.2d 107). Recklessness is not established by showing that the reporting in question was speculative or even sloppy (*Oliver* v. *Village Voice, Inc.* (S.D.N.Y. 1976) 417 F.Supp. 235, 238).

It may be argued that some of Block's activities were indicative of ill will toward Weingarten. Civil Code section 48a, subdivision 4(d), unlike the *New York Times* standard, includes in its definition of malice "hatred or ill will toward the plaintiff." However, under that section, such a state of mind does not constitute malice if occasioned by a good faith belief on the part of the defendant in the truth of the publication. Even under the *New York Times* standard, ill will does not constitute proof of knowledge of falsity (*Hotchner* v. *Castillo-Puche, supra,* 551 F.2d, p. 913).

An assertion that cannot be proved false cannot be held libelous (*Gregory* v. *McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 600-601 [131 Cal.Rptr. 641, 552 P.2d 425]). A writer canot be sued for simply expressing his opinion of another person, however unreasonable the opinion or vituperous the expression of it may be (*Gertz* v. *Robert Welch, Inc., supra,* 418 U.S., pp. 339-400 [41 L.Ed.2d, pp. 804-805]).

We turn in detail to the allegedly "false and reckless" statements in the order in which they appeared in the September 9 article of which Weingarten complains.

The reference to the possible return of Weingarten as city attorney for Seaside was not defamatory. In any event, Jaques indicated he

based this statement on sources at city hall and the city manager. Although the latter did not want to be quoted and did not remember making such a statement, Block's lack of malice is demonstrated by the legitimacy of the sources of information, as well as the extended controversy surrounding Weingarten's dismissal, the recall, and the length of time the city took to find a replacement.

As to the statement that the city attorney's position was a "$20,000 a year part-time legal job," the record indicates that the statement was accurate as of the time of the search, although Weingarten had been paid around $10,000-$12,000 annually during his tenure.

As to the innuendos that Weingarten misused his public positions to amass a fortune, the record, admittedly, contains no evidence indicating that anything of the kind had in fact occurred. However, we are not dealing with the correctness of the statements made, but the means by which Jaques obtained the information and the basis for the statements. Even an author whose function is to gather facts need not necessarily verify his information (*Fadell* v. *Minneapolis Star & Tribune Co., Inc., supra,* 425 F.Supp., p. 1085). The record indicates that at the time of his investigation, Jaques had no reason to disbelieve any of his sources. Erhman and Murray both charged Weingarten with making unfair and illegal profits in certain real estate transactions. The First Amendment protects the reporting of charges against a public official or figure "regardless of the reporter's private views regarding their validity. [Citations.] What is newsworthy about such accusations is that they were made. We do not believe that the press may be required under the First Amendment to suppress newsworthy statements merely because it has serious doubts regarding their truth. Nor must the press take up cudgels against dubious charges in order to publish them without fear of liability for defamation. [Citation.] The public interest in being fully informed about controversies that often rage around sensitive issues demands that the press be afforded the freedom to report such charges without assuming responsibility for them" (*Edwards* v. *National Audubon Society, Inc.* (2d Cir. 1977) 556 F.2d 113, 120; *Pierce* v. *Capital Cities Communications, Inc.* (3d Cir. 1978) 576 F.2d 495, 498).

Jaques' admission that his use of the term "insider information . . . may have been incorrect," at most, is an indication of carelessness. Weingarten did not dispute the fact and the $1.5 million estimate of his wealth, but indicated it was the result of some early and fortunate real

estate investments. The statement that Weingarten "earned more than $50,000 in some years" from his public employment as both city attorney and legal counsel for the Redevelopment Agency, was apparently true as to one year, in which it is not disputed that Weingarten received over $40,000 from the Redevelopment Agency. Thus, the inference that these earnings occurred in more than one year is mere negligence.

As to Weingarten's "prolific real estate practice," the record indicates that Weingarten testified that "real property investments" were one of his activities. Jaques based his statement on the grantor-grantee index, other official records, and a number of local attorneys who were identified. Several other attorneys named by Jaques were the source of the statement that some "found difficult to follow in business transactions" Weingarten's recollections of earlier oral agreements.

As to the statements concerning Weingarten's relations with the 50 percent black population of Seaside, the record indicates a number of instances where Weingarten's stand as city attorney or for the Redevelopment Agency, was opposed by a segment of the black community. For example, in 1969 the Redevelopment Agency was the defendant in a federal action charging racial discrimination brought by the Seaside Low Cost Housing Corporation which was represented by Mrs. Van Hook, the same attorney who represented the plaintiffs in the residential housing case discussed in the article. In 1969-1970, there was a controversy concerning the Seaside real estate disclosure ordinance as one council member believed it could be misused to foster racial discrimination. Jaques indicated that this portion of the article was based in part on a meeting he had with some of the dissident members of the black community at the home of Mrs. Carey, one of the recalled city council members.

There was also no "deliberate falsehood or recklessness" in statements pertaining to Weingarten's conduct as an officer, shareholder, and attorney for Allnav, Inc. The proxy fight and subsequent dissolution of Allnav are not disputed. Jaques met with former Allnav associates Hartmann and Gravelle, who both believed at that time that Weingarten, who was in total control of the corporation's assets, had unjustifiedly taken $30,000 in fees. They described his activities, the mysterious disappearance and reappearance of some of the corporate records, and their reliance on the pro-forma balance sheet.

As to the comments and innuendos concerning the Schacht litigation, the record also indicates that Jaques and Block believed them to be true. Mrs. Schacht and her attorney, Mr. Shostak, told Jaques that Weingarten forced her to accept a reduction in the judgment against her former husband. Weingarten personally purchased $60,000 of Mr. Schacht's savings and loan association stock and made the availability of Mr. Schacht's Carmel Valley lots known to the Allnav investment committee. Weingarten had a power of attorney to sell or lease Mr. Schacht's Pebble Beach house and received Mr. Schacht's mail. The description of the Parker litigation also strikes us as an accurate one. As to the comments concerning the bar association, Mr. Etienne stated that at the time of the Parker case, as well as at the time of the instant trial, he believed Weingarten should have been disciplined by the bar association.

The statement that Weingarten's office "sometimes served as a meeting place for rump sessions of the City Council" was also substantially true. Jaques acquired this information from several named individuals and had it confirmed by others. Sorri stated in his depositions that when he covered Seaside City Council meetings, he customarily attended semiclosed sessions of the council which preceded the regular meetings, with the understanding that he was not to directly quote anything that was said.

As to the statement "where there is smoke, there may be fire," the record merely indicates that at the trial five years later, the person to whom it was attributed did not remember making it at all. Jaques stated that the statement was attributable to that person, who was assured that he would not be mentioned in the article. Thus, there was no clear and convincing evidence of known falsity.

When the evidence adduced to show malice or recklessness in the instant case is measured against the clear and convincing standard, it is obvious that it meets none of the stringent requirements for actionable libel of a public official. Every statement has been traced to an identifiable source. There was no evidence that any of the sources denied giving the questioned information to Jaques or that Jaques either knew or had clear grounds to suspect that the statements might be false. All that the evidence reveals is that Jaques relied on one or two persons for each statement; two sources did not remember the statements attributed to them; others were actively involved in the events described in the ar-

ticle and had a bias against Weingarten. None of the statements under the circumstances constituted "reckless disregard for the truth."

Although accuracy and objectivity in reporting are goals for which all responsible news media strive, the protection of the First Amendment is not limited to statements whose validity are beyond question or which reflect an objective picture of the reported events. While verification of the facts remains an important reporting standard, a reporter, without a "high degree of awareness of their probable falsity" may rely on statements made by a single source, even though they reflect only one side of the story without fear of libel prosecution by a public official (*New York Times Company* v. *Connor, supra,* 365 F.2d, p. 576).

We conclude therefore that the court properly granted the nonsuit as to the causes of action for libel. Weingarten acknowledges that if the libel count fails, the cause of action for intentional infliction of emotional distress must also fail. (*Lerette* v. *Dean Witter Organization, Inc.* (1976) 60 Cal.App.3d 573, 579 [131 Cal.Rptr. 592].)

Weingarten's contention concerning the survival of the causes of action for conspiracy to commit libel is without merit. As Block's conduct was privileged under the *New York Times* rule, there was no wrongful act on which a conspiracy count could be based. (*Agnew* v. *Parks* (1959) 172 Cal.App.2d 756, 762 [343 P.2d 118]; *Widdows* v. *Koch* (1968) 263 Cal.App.2d 228, 234 [69 Cal.Rptr. 464].)

As to the cause of action for interference with prospective advantage, unjustifiable and wrongful conduct is also one of the requisite elements (*Scott* v. *McDonnell Douglas Corp.* (1974) 37 Cal.App.3d 277, 292 [112 Cal.Rptr. 609]). Thus, the nonsuit was also properly granted as to that cause of action.

The judgment of nonsuit is affirmed; the purported appeal from the order of November 24, 1976, is dismissed.

Rouse, J., and Miller, J., concurred.

A petition for a rehearing was denied March 14, 1980, and appellant's petition for a hearing by the Supreme Court was denied April 10, 1980.

## APPENDIX A

### "WEINGARTEN RETURN AS CITY ATTORNEY POSSIBILITY IN SEASIDE

"By Milton Jaques

"Herald Staff Writer

"Seaside City Council, which fired City Atty. Saul M. Weingarten last year, may want to hire him back if applicants continue to shun the $20,000 a year part-time legal job.

"That's the way some insiders in Seaside's gleaming and unpaid-for city hall view the desperate search to fill the vacant post.

"A Sept. 15 target date for picking a successor may soon go down the drain, it was learned. Applications are coming in slowly, with fewer than 10 in hand.

"Push Search

"City Manager Milton Farrell is pushing the search throughout California. Realistically, however, he expects the successful candidate will probably be a lawyer who is now engaged in private practice on the Monterey Peninsula.

"As the city's attorney since 1955, shortly after its incorporation, Weingarten had a hand in the rapid growth and development of the community outside the fence of Fort Ord.

"There, in 15 years, he amassed a fortune valued at $1,500,000. He earned more than $50,000 in some years from his public employment as both city attorney and legal counsel for the Redevelopment Agency of the City of Seaside. The redevelopment plum has paid more than $41,000 a year.

"After firing Weingarten last year, the city tried to hire a new attorney, but out of at least 40 applicants, not one was engaged. Legal advice in the interim has been furnished by several local attorneys. The city looks upon the job as requiring about half the time of a busy lawyer.

"Weingarten, at the same time he was guiding and advising the city with its problems, also engaged in a prolific real estate and legal practice. After leaving the Navy as an officer at the Postgraduate School in Monterey, he quickly gained a reputation for diligence and intelligence.

"Later, some found him difficult to follow in business transactions, particularly in his recollections of earlier verbal agreements.

"Backing

"Although enjoying solid backing from Seaside Mayor Louis N. Haddad, whom he serves as personal attorney, also, Weingarten encountered considerable opposition from some segments of the local populace. Black residents were disturbed by his appearances in behalf of a local landlord against whom a civil rights discrimination case was brought by a black couple.

"Minority groups equated Weingarten's public stance as a city attorney and as legal counsel to a federal housing program as requiring action in their behalf, instead of legal opposition.

"Weingarten also antagonized former associates of the Navy with whom he had banded together to form a land development group known as All-Nav, Inc. The group, put together about 1960 as a small-time and friendly operation, came upon hard times in the middle 1960s.

"Dissidents waged a proxy fight in the tiny corporation of about 130 members, who bought stock at $10 a share. The dissidents took over the corporation after a number of land deals made by Weingarten turned sour and landed in court. The dissidents discovered that Weingarten had been taking out as much as $30,000 a year in legal and consultant fees. This upset the naval people who thought they were part of a small, informal deal to make a little money in land, with no intention of paying big league salaries to officers. Weingarten shortly before his ouster was president, a member of the board and legal counsel to All-Nav, Inc.

"As city attorney during Seaside's infancy, Weingarten is credited with helping direct the city's major accomplishments, in growing from a World War II boom town into an orderly residential and commercial city. He handled legal details for the capital improvement program, including the paving of streets, the $20 million urban renewal program, and construction of the city's gleaming offices at Harcourt avenue and Canyon Del Rey boulevard.

"Surgery

"The city council since it fired Weingarten has undergone radical surgery. Three of four members — Gerald McGrath, Oliver Murray and Pearl Carey — were retired in a recall movement. Only Councilman Stephen Ross of the group voting to oust Weingarten remains.

"The urban redevelopment agency, composed of members recommended by the mayor and approved by the council, acts autonomously in selecting its own agency staff and legal counsel. A friendly council, of course, is likely to approve the mayor's selections.

"A friendly city council, too, could go along with the mayor who was outvoted in his opposition to the ousting of Weingarten by last year's council.

"Weingarten's biggest problem with combined public and private practice came in a series of suits brought against him over the past five years. Of these, only one had previously been disclosed in the press. In the legal battles, two court decisions ruled against Weingarten, and one, brought against him for fraud and to set aside fraudulent conveyances, was settled in secret.

"And although Haddad says Weingarten never lost a case while serving as city attorney, in his private practice, Weingarten's court record shows three substantial setbacks.

"Actually, Seaside druggist Fred Mitchell says he bested Weingarten in a case involving the right of customers to park at the Fremont Pharmacy's curbside. In the dispute, it developed that the State of California, and not the city of Seaside, as represented by Weingarten, controlled the regulation of parking on the busy thoroughfare.

"A 1965 suit brought by Mrs. Elizabeth L. Schacht of San Francisco against Weingarten probably set back the former Seaside city attorney as decisively as anything.

"Secret Settlement

"Tried in 1969 before a jury in superior court, it was settled secretly after a day and a half of testimony. It was learned that Weingarten paid between $40,000 and $50,000 to close the case.

"He had been brought into court accused of helping John H. Schacht, formerly of Pebble Beach, skip town to avoid paying a $216,000 judgment to his former wife.

"In 1964, Schacht liquidated his Monterey County assets and moved to Canada in the interval between Judge Anthony Brazil's announcement of the judgment from the bench, and the formal recording of the ruling.

"In attempting to find Schacht, investigators ran into Weingarten serving as a lawyer for him. Weingarten was accused of assisting in the rapid liquidation by personally buying $60,000 worth of savings and loan association stock from Schacht. He was also

accused of getting All-Nav, Inc., the land development group, to purchase Schacht's two building lots in Carmel Valley.

"Schacht handed the keys to his Pebble Beach house to Weingarten, with orders to lease or sell. Weingarten's Seaside office, which sometimes served as a meeting place for rump sessions of city council, became the 'mail drop' for the vanished Schacht.

"Weingarten was implicated in the case because the California Code for attorneys prohibits advising and assisting clients to avoid court judgments. Weingarten in his defense said Schacht had told him of intentions to appeal the judgment with a need for cash in case he had to comply with the court order.

### "Pleads 'Poor'

"The wealthy Weingarten, who also owns two houses in Pebble Beach, including one he rents to Seaside City Manager Milton Farrell, pleaded poverty in seeking to pay the secret settlement.

"After his first offer of $1,000 a month for 50 months was accepted, he returned with another offer of a flat $40,000, or a 20 per cent cut, for cash. This was also accepted.

"Mrs. Diane Charbonneau, who lived on Mingo street in Seaside in the early 1960s with her four children, also fought Weingarten successfully. She retained control of her property through litigation after the urban redevelopment lawyer, using insider information on land sales, sought to claim it as his own.

### "Barred

"A superior court judge cleared the way for Mrs. Charbonneau to sell her property to the redevelopment project, rejecting all claims of Weingarten to the property. The court barred Weingarten from interfering with the sale of her property.

"Years earlier, Weingarten had obtained a sheriff's deed to the property in a judgment against a former owner. He had not recorded the deed at the courthouse in Salinas, and a title search by Mrs. Charbonneau's attorney revealed that legal title had remained with a Southern California woman.

"Complicating the legal case was the fact that Weingarten had also taken a third deed of trust against the property after he had served as Mrs. Charbonneau's attorney in a divorce. His fee was $250, plus $25 costs.

### "Third Case

"The third losing case Weingarten encountered in his private practice involved charges of fraud, malpractice and negligence in his trusteeship of property on Casanova street, Monterey, on behalf of a widow.

"Lawyers still argue whether the Seaside attorney was actually found guilty of fraud in the suit brought by Mrs. Marie Parker for the recovery of her property. The newspapers carried the story both ways.

"Weingarten appealed Judge Hugh Donovan's ruling in superior court in Monterey County to the California Supreme Court, but to no avail. The only modification in the original ruling was a reduction in damages paid to the widow who had been wiped out of her $21,000 equity by the transactions of her attorney, her son, and his real estate partner.

"The judge, horrified by the legal tangle, stated from the bench:

"'You see, there is the viciousness of the whole thing. He (Weingarten) was acting for both parties with adverse interests...

"'And I reluctantly, I assure I reluctantly rendered this judgment because I thought there was a violation of the State Bar Act there.'

"In searching for a new city attorney, the Seaside City Council will not have the advice and assistance of the bar association. This advice is sought, for instance, by the U.S. Senate when it is asked to confirm presidential appointments to the federal bench.

"Formal complaints lodged with the bar association against the Seaside public official have been turned aside as inconsequential. In private conversations, local attorneys admit they are aghast at the problems created for them by the antics of their colleague in the bar.

"'Sure, he's giving us a bad name,' said one.

"'Where there's smoke, there may be fire,' one wise and judiciously-inclined older member observed.

"The city council, meantime, hopes to proceed with filling the attorneyship, and has not barred Weingarten from further consideration."